# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| YULONDA WOODS-EARLY, on behalf of herself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CORNING INCORPORATED,<br><br>Defendant. | Civil Case No.: 18-cv-6162<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Dr. Yulonda Woods-Early, on behalf of herself and others similarly situated, by and through her attorneys, Faruqi & Faruqi, LLP, hereby alleges as follows against Defendant Corning Incorporated ("Defendant," "Corning," or the "Company"):

## NATURE OF THE CLAIMS

1.      Corning, a multinational technology company specializing in designing and manufacturing materials for industrial and scientific applications, claims on its website that one of its priorities "is to expand leadership opportunities for Corning's diverse emerging talent."[1]

2.      Unfortunately, the Company's public messaging regarding diversity efforts could not be further from the experiences of the Black and female professionals upon whom Corning relies to design and engineer its products, as well as to conduct market research and strategy.

3.      Contrary to the narrative offered on the Company's website, Corning has not only failed to provide the same opportunity for advancement to Black and female professionals but has perpetuated this systemic discrimination throughout the Company, even in the face of numerous

---

[1]  https://www.corning.com/worldwide/en/sustainability/people/diversity.html (last visited Feb. 23, 2018).

1

complaints and data highlighting this widespread issue.

4.      Specifically, Corning has a practice of placing Black professionals in non-traditional roles that start at lower salaries than similar, traditional roles for which Black professionals are qualified.

5.      These Black professionals not only start at lower salaries, but they struggle to advance to higher-paying positions because the non-traditional roles in which they are placed offer no steady stream of work assignments or track for promotion to a senior role.

6.      Most critically, Corning maintains company-wide common policy and practice of consistently rounding down the performance review scores of Black and female professionals, while rounding up the performance review scores of their non-Black and male comparators.

7.      As such, regardless of whether they work in traditional or non-traditional roles, Black and female professionals are disproportionately given lower performance review scores – or no performance review scores at all – again ensuring that they are taken out of the track for promotions and raises in compensation.

8.      Indeed, Corning systematically pays Black and female professionals less than their non-Black and male peers, despite the fact that they perform equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility.

9.      Dr. Woods-Early, a Black woman, and others at Corning have presented the Company with hard data showing the effect of its discriminatory practices, but Corning has brushed these findings under the rug rather than addressing the problem.

10.     Having had her efforts to effect broader change at the Company stymied, in 2014, Dr. Woods-Early complained several times about the Company's discriminatory performance review, promotion, and compensation practices, as they had been applied specifically to her.

11.     In response, Corning refused to give Dr. Woods-Early a bona fide 2014 performance review and, within months, terminated her employment.

12.     Dr. Woods-Early's claims are brought, in part, under the Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), Section 1981 of the Civil Rights Act, 42 U.S.C. § 1981 ("Section 1981"), and applicable regulations thereunder, as a class action, pursuant to Federal Rule of Civil Procedure ("FRCP") 23, on behalf of herself and all other similarly situated persons who have been employed by Defendant as Professionals (as defined *infra* at ¶ 30) within the United States during the full statute of limitations periods.

13.     Dr. Woods-Early's claims are also brought, in part, under the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"), New York Labor Law, N.Y. Lab. Law §§ 190, *et seq.* ("NYLL"), and applicable regulations thereunder, as a class action, pursuant to FRCP 23, on behalf of herself and all other similarly situated persons who have been employed by Defendant as Professionals (as defined *infra* at ¶ 30) within the State of New York during the full statute of limitations periods.

14.     Dr. Woods-Early's claims are also brought, in part, under the Fair Labor Standards Act, as amended by the Equal Pay Act, 29 U.S.C. §§ 201, *et seq.* ("EPA"), as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of herself and all other similarly situated persons who have been employed by Defendant as Professionals (as defined *infra* at ¶ 30) within the United States during the full statute of limitations period.

## JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under Title VII, Section 1981, and the EPA.

16.    This Court also has subject matter jurisdiction over Plaintiff's claims under the EPA pursuant to 29 U.S.C. § 216(b).

17.    This Court also has supplemental jurisdiction over Plaintiff's related claims arising under State and/or local law pursuant to 28 U.S.C. § 1367.

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

19.    On February 22, 2016, Plaintiff, on behalf of herself and all other similarly situated individuals, filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the New York State Division of Human Rights.

20.    On November 28, 2017, the EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on December 1, 2017.

21.    Fewer than 90 days have passed since Plaintiff received her Notice of Right to Sue.

22.    Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

23.    Plaintiff Yulonda Woods-Early is a resident of the State of New York and was employed by Defendant Corning Incorporated from on or around August 13, 2007 through December 4, 2015.

24.    At all relevant times, Yulonda Woods-Early was an "employee" of Defendant within the meaning of all relevant statutes.

25.    Defendant Corning Incorporated is a domestic corporation with its principal place of business located at One Riverfront Plaza, Corning, New York 14831.

4

26.    At all relevant times Corning Incorporated was an "employer" within the meaning of all relevant statutes.

## FACTS

### I.    BACKGROUND

27.    Corning is a multinational technology company specializing in designing and manufacturing materials for industrial and scientific applications.

28.    Corning has approximately 45,000 employees worldwide, approximately 14,000 employees in the United States, and approximately 5,000 employees within the State of New York.

29.    Corning employs a lower-level staff to carry out the manufacturing and production of its products.

30.    Corning also employs more highly-educated, professional employees who design, engineer, and conduct market research and strategy for the Company's products and are classified in a "pay band" (described below) of "A" or higher ("Professionals").

31.    As detailed below, Black and female Professionals at Corning are discriminated against in the terms and conditions of employment afforded to them, as well as in their compensation relative to their non-Black and male counterparts.

### II.    ISOLATION OF BLACK EMPLOYEES TO DEPRESS PERFORMANCE AND UPWARD MOBILITY

32.    Corning perpetuates a company-wide deliberate pattern and practice of discriminating against Black Professionals by placing them in non-traditional roles, which limits Black Professionals' upward mobility within the Company.

33.    Professionals at Corning have various job titles, most of which have a specifically delineated track for promotion.

34.    For example, a Professional who is hired as a "Market Analyst" may eventually

earn a promotion to "Strategy Manager," followed by a promotion to "Market Development Manager."

35.    A Market Development Manager may eventually be promoted to Vice President ("VP") or another senior role.

36.    However, when Corning hires Black Professionals, it often places them in non-traditional roles, which have no delineated promotion track.

37.    This is because Corning engages in a pattern and practice of prioritizing hiring non-Black applicants, and only actively seeks out Black hires once all general traditional roles have been filled, leaving only very highly specialized or non-traditional roles into which those Black hires can be placed.

38.    Indeed, Corning routinely turns away Black candidates because they do not fit the very highly specialized or non-traditional roles available at the end of the hiring process.

39.    To be clear, these candidates are generally qualified and even overqualified for traditional roles; however, Corning refuses to review their applications until after all traditional roles have been filled.

40.    It is apparent that Corning prioritizes hiring a Black Professional only when doing so is necessary to fill a vacancy left by another Black Professional who has moved on from the Company.

41.    Corning's practice of placing Black Professionals in non-traditional roles, while placing non-Black Professionals in traditional roles, results in Black Professionals being compensated less than their non-Black comparators.

42.    Further, Black Professionals placed in non-traditional roles are put at a significant disadvantage with respect to performance reviews, as little to no work is assigned to them.

43.    Rather, they are expected to obtain their own work proactively, a hurdle to success with which non-Black Professionals are typically not faced.

44.    This fosters an environment in which Black Professionals are given less opportunity to obtain promotions and increase their compensation over time.

## III.    DEPRESSED PERFORMANCE REVIEW RATINGS FOR BLACK AND FEMALE EMPLOYEES

45.    Corning engages in a company-wide deliberate pattern and practice of discriminating against Black and female Professionals by evaluating their performance more poorly than their non-Black and male comparators.

46.    Black and female Professionals throughout the Company are subjected to this type of discrimination regardless of whether they are placed in traditional or non-traditional roles.

47.    To evaluate performance, Corning rates Professionals on the seven "Corning Values": (i) quality; (ii) integrity; (iii) performance; (iv) leadership; (v) innovation; (vi) independence; and (vii) individual.

48.    Professionals are rated on each of the seven Corning Values on a scale of 1 to 5. A performance rating of 1 means an employee has "failed to meet expectation;" 2 means "partially met expectations;" 3 means "fully met expectations;" 4 means "exceeded expectations;" and 5 means "far exceeded expectations."

49.    The overall performance review score is based on: (1) the Manager score; and (2) the overall Participant score.

50.    Professionals also have to submit a Self-Evaluation score after rating themselves from 1 to 5 on each of the seven Corning Values; however, this score is largely disregarded and not factored into the overall performance review score.

51.    For the Manager score, Corning Professionals receive a rating from 1 to 5 on each

7

of the seven Corning Values from their direct supervisors, or "Managers."

52.    For the Participant score, Corning Professionals are required to identify approximately two to seven clients, referred to as "Participants" with whom they have worked with.

53.    Corning then contacts the Participants directly asking if they would participate in the review process and sends each of them a survey with a rubric to score the Professional on a scale of 1 to 5 for each of the seven Corning Values.

54.    Corning maintains the anonymity of each Participant's responses throughout the entire review process and assures the client of this when the survey is sent.

55.    Clients are free to decline the request to complete the survey, which many clients do.

56.    Once scores are received from all the Participants, they are averaged together to calculate an overall Participant score, between 1 and 5, to be factored into the performance review.

57.    The overall Participant score is considered along with the Manager score, to determine each Professionals' overall performance review score between 1 and 5.

58.    The overall performance review score is always an integer between 1 and 5.

59.    Corning maintains a company-wide common policy and practice of first averaging the Manager score and the overall Participant score, and then consistently rounding down this averaged number to the nearest integer for the overall performance review score of Black and female Professionals, while rounding up this averaged number to the nearest integer for the overall performance review score for non-Black and male Professionals.

60.    For example, if the combined average score for a Black or female Professionals' Manager and Participant scores is a 3.9, his or her overall performance review score will be

8

rounded down to a 3, while the overall performance review score of a non-Black or male comparator will be rounded up to a 4.

61.     Corning further discriminates against Black and female Professionals in the review process by adding additional hurdles to success.

62.     For example, whereas Professionals are typically required to identify approximately two to seven clients to act as Participants in the review process, Corning will often ask Black and female Professionals to identify as many as 25 clients.

63.     Supervisors at Corning also discriminate against Black and female Professionals by failing to give them overall performance review scores in certain years.

64.     As detailed below, this has the effect of preventing Black and female Professionals from being considered for roles within the Company's executive leadership.

65.     The discriminatory nature of the performance review process is reflected in data showing a bimodal distribution of performance scores by race, in which the bulk of Black Professionals' ratings fall within the 1-3 range, whereas the bulk of non-Black Professionals score in the 3-5 range.

66.     Corning's own data also shows a company-wide bimodal distribution of performance scores by gender, with women generally scoring significantly lower than men.

67.     The discriminatory nature of Corning's review process is further revealed by the disproportionate number of white men in Corning's executive leadership.

68.     This outsized representation of white men in leadership is a direct result of Corning's policy and practice of tying performance scores directly to compensation and eligibility for promotion.

IV.    **UNEQUAL PAY TO BLACK AND FEMALE EMPLOYEES**

69.    Corning generally conditions promotions and raises on receiving strong performance review scores.

70.    One such policy that ties performance reviews to upward mobility is Corning's requirement that a Professional receive overall performance review scores of 4 or higher in consecutive years in order to be considered for promotion to a role within the Company's executive leadership.

71.    Due to Corning's discriminatory performance evaluation process, this policy results in a deliberate pattern and practice of discriminatorily compensating Black and female Professionals less than their non-Black and male comparators by preventing them the same opportunity for promotion.

72.    Corning compensates its Professionals based on their placement in certain pay "bands" ranging from, at the lowest, A, to, at the highest, 88.

73.    Corning determines which Professionals are placed in each pay band by looking to the Professionals' performance review scores.

74.    As noted above, Professionals who receive scores of 4 or higher in consecutive years are placed in the pool of candidates who will be groomed for leadership and, thus, placed in higher pay bands and eligible to receive higher bonuses.

75.    Due to their deflated performance review scores, Black and female Professionals at Corning are given less opportunity to obtain promotions, and thus receive less compensation than their non-Black and male peers.

76.    Data from Corning's Chief Diversity Officer ("CDO") shows that, of the following four groups – Black women, Black men, non-Black women, and non-Black men – non-Black men

10

are compensated the most, followed by non-Black women, followed by Black men and, lastly, followed by Black women, who are consistently compensated less than any other group of Professionals at the Company.

## V.    PLAINTIFF DR. YULONDA WOODS-EARLY

### A.    Background

77.    Dr. Woods-Early worked at Corning from on or around August 13, 2007 through on or around December 4, 2015.

78.    Dr. Woods-Early is Black, African-American, and a woman.

79.    Dr. Woods-Early was initially hired by Corning as a Marketing Consultant I.

80.    As a Marketing Consultant I, Dr. Woods-Early was responsible for providing research and analysis to determine new market opportunities and strategies for Commercial Managers and Directors.

81.    As a Marketing Consultant I, Dr. Woods-Early was paid a starting salary of $70,000, placing her in the "B" pay band – the second-lowest compensation level for Corning Professionals.

### B.    Discrimination and Unequal Pay Based on Race, Color, and Sex

#### i.    Placement in a Non-Traditional Role with Little Upward Mobility

82.    The position of Marketing Consultant I is a non-traditional role, with no predetermined path for promotion, and no set structure for compensation or the progression thereof.

83.    Put differently, the role of Marketing Consultant I operates entirely outside of Corning's traditional organizational structure.

84.    As far as she is aware, Dr. Woods-Early is the only Marketing Consultant I to ever

work at Corning.

85.     As a Marketing Consultant I, Dr. Woods-Early performed substantially the same duties as a Market Development Manager or Strategy Manager.

86.     In other words, the role of Marketing Consultant I required equal skill, effort, and responsibility as the roles of Market Development Manager and Strategy Manager.

87.     Further, the roles of Marketing Consultant I, Market Development Manager, and Strategy Manager are performed under similar working conditions.

88.     Indeed, a Market Development Manager's core responsibilities are to determine market needs and trends with respect to specific Corning products, as well as develop and deliver sales strategies.

89.     A Strategy Manager's main functions are to develop, recommend, and execute near- and long-term strategic options to support Corning's business.

90.     These descriptions closely resemble Dr. Woods-Early's role of Marketing Consultant I, which requires conducting market research and analysis to determine Corning's strategic and sales approach with respect to specific Corning products.

91.     However, Market Development Managers and Strategy Managers generally receive starting salaries of approximately $120,000 and $90,000, respectively, whereas Dr. Woods-Early began at a salary of $70,000.

92.     In 2011, Dr. Woods-Early was promoted to the role of Marketing Consultant II.

93.     In this role, she performed research and analysis to shape new market and technology decision-making for Corning's senior leadership.

94.     Like the role of Marketing Consultant I, the role of Marketing Consultant II falls outside of the traditional organizational structure, and has no established path for promotions or

increases in compensation.

95.    Notably, when Dr. Woods-Early was promoted, Corning had positions available within its traditional organizational structure, such as openings for Market Development Managers, Strategy Managers, Market Managers, and Customer Managers, all of which have similar job responsibilities as compared to a Marketing Consultant.

96.    However, these positions were filled by non-Black and male Professionals.

97.    Both at the time of her hire, as well as in 2011, Dr. Woods-Early was eminently qualified for a managerial role.

98.    Corning routinely offers managerial roles to non-Black and male Professionals with Master of Business Administration degrees ("MBAs") or Doctor of Philosophy degrees ("PhDs") and little or no work experience.

99.    Dr. Woods-Early, on the other hand, has a PhD in Economics and several years of work experience, including multiple years of experience within Corning.

100.    Further, executives at Corning have confirmed to Dr. Woods-Early on multiple occasions that she is indeed qualified for a managerial role.

101.    By way of example, on October 5, 2010, James Rideout, Corning's VP of Strategy and External Development, informed Dr. Woods-Early that he had placed her on a list of candidates for a Strategy Manager position.

102.    Moreover, in 2013, George Kellogg, Corning's Innovative Program Manager, encouraged Dr. Woods-Early to apply for a role as Market Research Manager.

103.    During the same year, Anis Fadul, Corning's Director of Marketing and Strategy, encouraged Dr. Woods-Early to apply for an End Market Contact Program Manager position.

104.    Dr. Woods-Early applied to both of these positions in 2013 but was never offered

an interview.

105.    Corning also prevented Dr. Woods-Early from obtaining a managerial role by refusing to ever give her an interview, despite her objective qualification for several positions.

106.    By way of example, on April 28, 2014, Corning listed an opening for a Market Development Manager position.

107.    Dr. Woods-Early applied for the position, and was objectively qualified for the position, but was denied an interview.

108.    Similarly, on February 10, 2015, Dana Moss from Corning's Human Resources ("HR") department encouraged Dr. Woods-Early to apply to a managerial role, only to later inform her that the position had subsequently been filled and she was not even given an interview.

109.    On March 3, 2015, Dr. Woods-Early emailed Ms. Moss regarding her interest in the seemingly open position of Business and Strategic Analysis Manager.

110.    Ms. Moss responded by informing Dr. Woods-Early that despite the opening being posted, Corning had already filled the position with their desired candidate, again denying Dr. Woods-Early the opportunity to interview.

111.    Despite her qualifications and tireless efforts to find a traditional role, Corning routinely filled such positions with their "desired candidates" – non-Black male candidates – and never allowed Dr. Woods-Early to so much as interview for a position with clear growth opportunity, forcing her to remain in the non-traditional role of Consultant.

112.    Indeed, as both a Marketing Consultant I and a Marketing Consultant II, Corning discriminated against Dr. Woods-Early by forcing her to generate her own work, while Professionals in analogous traditional roles had assignments given to them by superiors.

113.    Dr. Woods-Early was also rarely given supervision or feedback.

114.    Over her eight-year tenure with Corning, Dr. Woods-Early's supervisors met with her infrequently and often did not speak to her for months at a time.

115.    This put Dr. Woods-Early at a distinct disadvantage with respect to performance reviews.

116.    Further, Corning's requirement that Dr. Woods-Early obtain her own work presented a hurdle to success with which non-Black Professionals are not faced.

117.    This fostered an environment in which Dr. Woods-Early was given less opportunity to obtain promotions and increase her compensation over time as compared to her non-Black and male peers.

118.    Dr. Woods-Early is also aware of other occasions on which Corning has attempted to place Black professionals in non-traditional roles.

119.    Specifically, in 2013, after two Black Professionals resigned from Corning, the Company approached Dr. Woods-Early and other members of the Black Technology Network ("BTN"), an affinity group at Corning, to recruit replacements.

120.    This was consistent with Corning's company-wide practice of only seeking out Black applicants after Black Professionals had left the Company or at the tail end of a recruitment period.

121.    Dr. Woods-Early met with Michael Carlineo, an employee in HR, among others, to discuss recruiting two Black replacements.

122.    Dr. Woods-Early identified more than 20 Black applicants.

123.    HR informed Dr. Woods-Early and other members of BTN that the Company would "create roles" for the two applicants to be selected – in other words, place them outside of the traditional promotion track – despite the search having begun with an effort to replace Black

Professionals who were in traditional roles.

124.     Dr. Woods-Early objected, explaining to the Company that this would place the Black applicants at a disadvantage by providing them with no clear path for promotions or raises.

125.     Dr. Woods-Early also has personal knowledge that Corning does not consider Black applicants for employment as Professionals until all general traditional roles have been filled, leaving only very highly specialized or non-traditional roles in which to place the Black applicants.

126.     In 2012, during a hiring spree at Corning, Dr. Woods-Early and other members of BTN tried for months to obtain a meeting with HR to discuss hiring Black Professionals.

127.     Eventually, HR agreed to a meeting.

128.     Several people attended this meeting, including HR Director Gary Pease and Everton Callum from HR, as well as Dr. Woods-Early, Dr. Jimmie Williams, and Dr. Carlton Truesdale from BTN.

129.     Dr. Williams and Dr. Truesdale are both Black men.

130.     During this meeting, Mr. Pease explained that the hiring spree was approximately 75% complete, and **no Black Professionals had been hired**.

131.     Mr. Pease further explained that all traditional roles within the Company had been filled, leaving only very highly specialized or non-traditional roles in which Corning could place Black hires.

132.     Dr. Woods-Early and other members of BTN expressed their concern that this hiring spree had only exacerbated the lack of diversity within Corning.

133.     To this, Mr. Pease responded, "We messed up."

134.     During a subsequent meeting with all of BTN regarding the hiring spree, Mr. Pease

again admitted that Corning had "messed up" by not making sufficient efforts to recruit Black Professionals into traditional roles.

135.    Moreover, in or around 2013, Dr. Woods-Early recruited Temiko Scott, a Black man, for a Market Analyst position at Corning.

136.    The job description for the position required only a Bachelor of Arts or Bachelor of Science degree and a few years of experience.

137.    Mr. Scott had a Bachelor of Science degree, had recently received his MBA, and had several years of relevant experience.

138.    However, after Dr. Woods-Early spoke with Mr. Pease about Mr. Scott's candidacy, Mr. Pease later sent her an email stating that he had no idea where he could possibly place Mr. Scott.

139.    While Mr. Scott never received so much as an interview at Corning, the Company ultimately hired a non-Black applicant with an MBA to fill the position for which Mr. Scott had applied.

140.    Mr. Scott also applied for a second position at Corning for which he was qualified, but similarly did not receive so much as an interview.

      **ii.    Artificially Depressed Performance Reviews**

141.    From 2007 through 2014, Dr. Woods-Early's performance review scores were artificially deflated.

142.    Specifically, after tabulating Dr. Woods-Early's average scores on the seven Corning Values from her Manager and Participants, her overall performance review score was consistently rounded down or, often times, not provided at all.

143.    By way of example, in 2007, the average of Dr. Woods-Early's Manager score and

overall Participant score equaled 2.86.

144.    However, Dr. Woods-Early was given an overall performance review score of 2 for her 2007 performance review.

145.    Similarly, in 2012, the average of Dr. Woods-Early's Manager score and overall Participant score equaled 3.75.

146.    However, Dr. Woods-Early was given an overall performance review score of 3 for her 2012 performance review.

147.    Further, Dr. Woods-Early did not receive performance reviews from her Manager for 2010, 2011, and 2013, and thus never received an overall score for those years.

148.    Put differently, the only years for which Dr. Woods-Early received consecutive performance review scores were 2007, 2008, and 2009.

149.    Further, Corning often took additional steps to deflate Dr. Woods-Early's performance scores by adding hurdles to success with which her non-Black and male counterparts were not faced.

150.    By way of example, in 2014 (as well as 2015), Dr. Woods-Early performed significant work on a project for Corning West Technology Center ("CWTC").

151.    However, when Corning distributed its preliminary market analysis following an internal conference, Dr. Woods-Early discovered that the data she compiled, and which had been approved by project leader Dr. Donnell Walton (a Black man), had been removed and replaced by data compiled by Newry Corp. ("Newry"), a consulting firm.

152.    Dr. Walton later shared with Dr. Woods-Early privately that Charles Craig, Dr. Woods-Early's Manager from 2011 through her termination, demanded that Dr. Woods-Early's work be removed, and that data provided by Newry be used instead.

18

153.    Later, in preparation for her 2014 performance review, Mr. Craig insisted that Dr. Woods-Early include CWTC as a Participant, knowing that her data had not been circulated following the conference and that the project was still ongoing.

154.    This negatively impacted Dr. Woods-Early's Participant score from CWTC, and also had the effect of decreasing her visibility within the Company.

155.    Similarly, for 2014, Dr. Woods-Early received an average score of 4 from another Participant, who Mr. Craig revealed to be Francois Barbeau.

156.    However, during her performance review meeting, Mr. Craig informed Dr. Woods-Early that he had personally reached out to Mr. Barbeau directly to discuss the score, and that Mr. Barbeau purportedly claimed that he should have given Dr. Woods-Early a 3.

157.    Mr. Craig used this purported statement, which contradicted the written survey submitted by Mr. Barbeau, to give Dr. Woods-Early a 3 and keep her out of consideration for an executive role, despite writing in an email to Ms. Moss that 2014 had been her most successful year to date.

158.    Dr. Woods-Early's supervisors have also made statements to her evincing discriminatory animus, such as when her former supervisor Peter Grittner condescendingly asked her whether she knew the difference between Austria and Australia.

159.    During the same review, Mr. Grittner told Dr. Woods-Early he thought she would be best suited for a lower-level communications role, "like Oprah."

160.    Needless to say, this stereotypical remark evinces Corning's systemic bias against Dr. Woods-Early based on her race, color, and sex.

161.    Dr. Woods-Early is also aware of other Black Professionals at Corning who were subjected to similar discriminatory performance review processes.

19

162.    For example, in 2015, Dr. Arthur Martin, a Black man, shared with Dr. Woods-Early that his supervisor, Dr. David Dawson-Elli, required him to obtain 25 Participants for his annual review, whereas Professionals are typically asked to provide only about two to seven Participants.

163.    Dr. Martin nevertheless complied and, in fact, received glowing Participant reviews and an average Participant score greater than 4.

164.    Dr. Dawson-Elli dismissed Dr. Martin's Participant scores as being the result of Dr. Martin's purportedly "intimidating" his clients and gave Dr. Martin a 3, thereby keeping Dr. Martin out of the pipeline for promotion to an executive role.

165.    As noted above, Corning – not the particular Professional – sends survey requests to clients, and clients are free to refuse to respond.

166.    Moreover, clients are assured that their submissions will remain anonymous, as Professionals will only receive the Participant scores and comments, but not the client's name.

167.    Indeed, Dr. Dawson-Elli's comment not only made no sense, but also surely would not have been made to a non-Black Professional.

168.    Similarly, in or around 2014, Dr. Woods-Early spoke to Dr. Truesdale regarding the strong year he was having.

169.    Dr. Truesdale remarked that it did not matter, because he will "always get a 3" no matter what his performance numbers reflect.

170.    The discrimination in Corning's performance review process is also supported by data presented to the Society of Black Professionals ("SBP"), an affinity group at Corning.

171.    Specifically, on January 4, 2010, Corning executive Hank Jonas gave a presentation to the SBP regarding the performance of Black Professionals.

172.    Mr. Jonas's presentation included a graph comparing the company-wide performance review scores awarded to Black Professionals and those awarded to non-Black Professionals.

173.    The data reflected a bimodal distribution of performance review scores by race and color, in which the bulk of Black employee ratings fell within the 1-3 range, whereas the bulk of non-Black Professionals scored in the 3-5 range.

174.    Mr. Jonas offered no explanation for the distribution.

175.    Approximately 40 members of the SBP were in the room during this presentation, including, without limitation, Dr. Woods-Early and Dr. Walton.

176.    Following the presentation, Dr. Truesdale expressed his concern that the distribution was clearly caused by discriminatory bias and the Company's consistent practice of rounding down the performance review scores of the Black Professionals.

177.    Notably, after this data had been presented, Mr. Pease asked BTN to include a sentence in the group's mission statement regarding fostering strong performance.

178.    Dr. Woods-Early, Dr. Williams, and Dr. Truesdale approached Mr. Pease afterwards to tell him they viewed his directive as derogatory and offensive, as no non-Black affinity group had been given the same or a similar instruction.

179.    Because Corning considers only Professionals who receive scores of 4 or higher in consecutive years for leadership roles, and thus higher salaries and bonuses, Corning's disparate performance review process effectively ensured that Dr. Woods-Early and other Black and female Professionals would never attain the same title or level of compensation as their non-Black and male peers.

21

### iii.    Unequal Pay

180.    Due to her deflated overall performance review scores, Dr. Woods-Early never advanced beyond the "C" pay band – the third-lowest band and only one level higher than that at which she was hired – despite nearly a decade of service to the Company.

181.    Indeed, Dr. Woods-Early never attained a salary higher than $99,000.

182.    As noted above, Dr. Woods-Early was the only Marketing Consultant at Corning due to the Company placing her in a non-traditional role; however, her final salary after eight years at Corning was still less than the $120,000 starting salary for a Market Development Manager.

183.    As also noted above, Dr. Woods-Early performed equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility as a Market Development Manager.

184.    Dr. Woods-Early's salary was also consistently lower than that of a Strategy Manager performing equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility.

185.    Put differently, based on her race and sex, Dr. Woods-Early was discriminatorily paid less than non-Black and male Market Development Managers and Strategy Managers at Corning, despite performing equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility.

186.    Corning's discriminatory compensation of Dr. Woods-Early was not limited to her; rather, it is supported by data provided by Corning's former CDO, Debra Turney Bailey.

187.    Ms. Bailey provided compensation data of Corning Professionals in different demographics.  The data showed distributions of Black and female Professionals by pay band, time in each pay band, and promotion.

22

188.    This data was presented to Mr. Callum for the specific purpose of highlighting the systemic discrimination and widespread discriminatory impact of the Company's recruitment, promotion, and compensation practices, as well as to propose solutions.

189.    The presentation included data showing that, of the following four groups – Black women, Black men, non-Black women, and non-Black men – non-Black men were compensated the most, followed by non-Black women, followed by Black men and, lastly, followed by Black women, who were compensated less than any other group of Professionals.

190.    Notably, the data showed that, all but 10 of the Black female Professionals were placed in pay bands "A" and "B", the two lowest levels of compensation for Professionals.

191.    To Dr. Woods-Early's knowledge, Corning took no remedial action after being presented with this information.

192.    Dr. Woods-Early is aware of multiple Black women throughout the Company who have complained to Corning about the Company's refusal to provide them a path to promotion and increased compensation, some of whom had resigned from Corning due to this inequality.

193.    By way of example only, in approximately October 2015, Dr. Woods-Early met Vernicia Dawes, a Black woman who worked for Corning in North Carolina, at a dinner hosted by SBP's Black Women's Forum.

194.    Ms. Dawes shared with Dr. Woods-Early that she too had been subjected to the same discriminatory policies and practices as Dr. Woods-Early.

195.    Ms. Dawes eventually left Corning due to lack of progression in her pay and was only able to obtain a senior role at Corning by earning promotions and raises elsewhere, and subsequently returning to the Company.

196.    Similarly, in 2014, Dr. Woods-Early spoke with Charles Cruz, a Black man who

also worked for Corning in North Carolina, at length regarding barriers to promotions and raises for Black Professionals at Corning.

197.     Mr. Cruz confirmed that he too was subjected to Corning's discriminatory policies and practices and that such practices are systemic throughout the Company.

C.     **Retaliation**

198.     On September 27, 2010, Corning transferred Dr. Woods-Early to the supervision of Mr. Craig.

199.     Corning did not give Dr. Woods-Early any reason for the transfer.

200.     From the date of Dr. Woods-Early's transfer through her termination, Mr. Craig consistently failed to assign work to Dr. Woods-Early.

201.     Dr. Woods-Early objected to this constantly, as Market Development Managers and Strategy Managers regularly receive work assignments from their superiors.

202.     Moreover, Mr. Craig also consistently refused to meet with Dr. Woods-Early despite her untiring efforts to schedule face time.

203.     By way of example only, in 2013, Mr. Craig met with Dr. Woods-Early only three times.

204.     Mr. Craig seemed unbothered by Dr. Woods-Early's lack of assignments, and never suggested that she was at risk for termination because of it.

205.     On July 3, 2014, Dr. Woods-Early met with Ms. Moss and told her that she did not feel Mr. Craig would have refused to assign her work or meet with her for a year if she were not Black and a woman.

206.     Shortly thereafter, Ms. Moss sent Dr. Woods-Early an email thanking her for lodging her protected complaint.

24

207.    To Dr. Woods-Early's knowledge, Corning never investigated her complaint.

208.    On August 21, 2014, Dr. Woods-Early attended a meeting with Mr. Craig, Mr. Pease, and Ms. Moss, during which Mr. Craig made negative comments regarding two Black Professionals.

209.    The two Professionals Mr. Craig referenced had no relevance to the meeting or Dr. Woods-Early, aside from the apparent fact that they were also Black, which Mr. Craig had noted.

210.    On September 4, 2014, Dr. Woods-Early met with Ms. Moss again to complain about Mr. Craig's derogatory remarks during the August 21, 2014 meeting, and inquire about finding alternative positions within Corning that would allow her to report to a different supervisor.

211.    Ms. Moss explained that she purportedly did not remember Mr. Craig's discriminatory comments but, regardless of whether discriminatory comments were made, Dr. Woods-Early "should not worry about it."

212.    Ms. Moss's dismissal of Dr. Woods-Early's protected complaint is consistent with Corning's company-wide policy and practice of treating Black and female Professionals inequitably, while brushing any complaints or evidence regarding the same under the rug.

213.    During this same meeting, Ms. Moss asked Dr. Woods-Early to provide an accounting of all projects which she had worked on at Corning, as well as her supervisor on each project.

214.    It was clear to Dr. Woods-Early that Corning was gathering information in preparation for terminating her in retaliation for her complaints of discrimination.

215.    Notably, on November 7, 2014, Ms. Moss told Dr. Woods-Early that if she wanted to no longer report to Mr. Craig, she needed to undertake efforts to find alternate jobs and to provide documentation of such efforts because Dr. Woods-Early is "different" than her non-Black

and male peers.

216.    On March 6, 2015, Dr. Woods-Early had a performance review with Mr. Craig.

217.    During the approximately two months prior to the meeting, Dr. Woods-Early attempted to have Ms. Moss or another HR professional sit in on the meeting, as she feared she might be subjected to additional discrimination by Mr. Craig.

218.    Despite Dr. Woods-Early's efforts, no one from HR attended the meeting.

219.    Accordingly, at the beginning of the meeting, Dr. Woods-Early informed Mr. Craig that she was recording the meeting.

220.    During this meeting, Mr. Craig explained to Dr. Woods-Early that her overall performance review score was again rounded down because he had purportedly spoken to one of her Participants, who had given her scores of 4s, and the Participant allegedly told Mr. Craig that he should have instead given her scores of 3s.

221.    On March 9, 2015, the following business day, Mr. Craig emailed Ms. Moss, stating that it was "clear that the supervisory-employee relationship has been and is certainly now highly dysfunctional and needs to be changed as soon as possible.  The level of distrust and perception of bias by the employee vs. the supervisor cannot be perpetuated any longer."

222.    Mr. Craig's reference to "bias" unmistakably shows that he was aware of Dr. Woods-Early's complaints of discrimination when he sent the email.

223.    Mr. Craig's knowledge and cognizance of Dr. Woods-Early's protected activity is further illustrated by his mention in the same email that he is committed to working with diverse groups.

224.    Notably, Mr. Craig also stated in this email that 2014 had been Dr. Woods-Early's best year ever.

26

225.    On March 19, 2015, at Ms. Moss's request, Dr. Woods-Early met with Ms. Moss.

226.    During the meeting, Ms. Moss asked Dr. Woods-Early why she felt the need to record her March 6, 2015 performance review meeting.

227.    Dr. Woods-Early explained, as she had explained during her July 3, 2014 and September 4, 2014 meetings with Ms. Moss, that she did not trust Mr. Craig and wanted to document potential discrimination.

228.    Ms. Moss took offense and claimed that Corning could not possibly have fostered a hostile work environment because, in Ms. Moss's view, a work environment can only be hostile if a supervisor "yells at an employee constantly."

229.    Ms. Moss's comments show that Corning had no interest in investigating Dr. Woods-Early's complaints.

230.    Rather, the Company's goal was to silence them in whatever way necessary.

231.    On March 31, 2015, the deadline for Mr. Craig to complete Dr. Woods-Early's 2014 performance review lapsed.

232.    Dr. Woods-Early never received a bona fide performance review for 2014.

233.    On April 17, 2015, Dr. Woods-Early emailed HR, again complaining of discrimination based on race, color, and sex.

234.    To Dr. Woods-Early's knowledge, Corning again failed to investigate her complaint.

235.    On August 6, 2015, Dr. Woods-Early met with Ms. Moss and Kevin Corliss, another HR employee.

236.    Ms. Moss and Mr. Corliss informed Dr. Woods-Early that her employment would be terminated in 90 days, for the stated reason that there was "no fit" for her at Corning.

237.    Dr. Woods-Early was also told to stop all of her work assignments following this meeting.

238.    Dr. Woods-Early had complained about lack of work assignments for years, yet Corning had never previously viewed it as an issue or indicated that it might cause Dr. Woods-Early to lose her job.

239.    In fact, as noted above, Mr. Craig stated on March 9, 2015, that 2014 had been Dr. Woods-Early's best year to date.

240.    Moreover, as of August 6, 2015, Dr. Woods-Early was actively working on a particularly busy project for Silver Oxide, which was scheduled to expand going forward.

241.    Further, on August 20, 2015, Corning's Chief Innovation Officer, Martin Curran, asked Dr. Woods-Early to work further on a project related a set of products called Sensors on Glass.

242.    Dr. Woods-Early was forced to stop working on the Silver Oxide project and decline the Sensors on Glass based on the directive from Corning and HR.

243.    Indeed, the Company's stated reason for firing Dr. Woods-Early was transparently pretextual.

244.    In reality, Company had been attempting to push her out since her March 6, 2015 protected activity.

## COLLECTIVE ACTION ALLEGATIONS

245.    Plaintiff brings her First Cause of Action as a collective action under the EPA and applicable regulations thereunder.

246.    Plaintiff seeks to maintain claims, pursuant to 29 U.S.C. § 216(b), on behalf of herself and all other similarly situated persons who are women who have been, are now, or will be

employed by Defendant as Professionals at any location in the United States during the full statute of limitations period, up to and including the date of any judgment in this action (the "EPA Collective").

247.    At all relevant times, Plaintiff and the EPA Collective were similarly situated, had substantially similar job requirements, were paid in the same manner and under the same common policies, plans, and scheme, and were subject to Defendant's practices of paying Plaintiff and the EPA Collective less than their male counterparts.

248.    Defendant's systematic discrimination against Plaintiff and the EPA Collective based upon sex is continuing in nature.  Indeed, Plaintiff and the EPA Collective were paid less and denied promotions at a rate greater than that of their similarly situated male counterparties, despite performing equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility.

249.    Throughout the full statute of limitations period, Defendant has been fully aware of the duties performed by Plaintiff and the EPA Collective, and that those duties were not exempt from the provisions of the EPA.

250.    Defendant's violations of the EPA have been willful, repeated, knowing, intentional, and without a good faith basis, and have significantly damaged Plaintiff and the EPA Collective.

251.    As a result of Defendant's conduct, Defendant is liable to Plaintiff and the EPA Collective for the full amount of their wages lost as a result of Defendant's unlawful and discriminatory practices, with interest, plus an additional equal amount as liquidated damages, plus the attorneys' fees and costs incurred by Plaintiff and the EPA Collective.

252.    While the exact number of the EPA Collective is unknown to Plaintiff at this time,

29

and can only be ascertained through appropriate discovery, Plaintiff believes there are approximately 4,000 other similarly situated persons who were employed by Defendant as Professionals within the United States during the full statute of limitations period.

253.    Plaintiff is currently unaware of the identities of the members of the EPA Collective.

254.    Accordingly, Defendant should be required to provide Plaintiff with a list of all persons employed by Defendant as Professionals within the United States during the full statute of limitations period, along with their last known addresses, telephone numbers, and email addresses, so Plaintiff can give the EPA Collective notice of this action and an opportunity to make an informed decision about whether to participate in it.

## CLASS ACTION ALLEGATIONS – UNEQUAL PAY BASED ON GENDER

255.    Plaintiff brings her Second Cause of Action as a class action under the NYLL, as well as applicable regulations thereunder.

## I.    CLASS DEFINITION

256.    Plaintiff also seeks to maintain claims, pursuant to FRCP 23, on behalf of herself and a class of all other similarly situated persons who are women and have been, are now, or will be employed by Defendant as Professionals within the State of New York at any time during the full statute of limitations period, up to and including the date of any judgment in this action (the "NY Unequal Pay Class").

257.    Plaintiff alleges on behalf of herself and the NY Unequal Pay Class that Defendant violated, *inter alia*, the NYLL by discriminating against female Professionals within the State of New York by paying them less than their male counterparts based on their sex.

258.    Defendant's systematic discrimination against Plaintiff and the NY Unequal Pay

Class based upon sex is continuing in nature. Indeed, Plaintiff and the NY Unequal Pay Class were paid less and denied promotions at a rate greater than that of their similarly situated male counterparts, despite performing equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility.

259.    Plaintiff and the NY Unequal Pay Class have standing to seek such relief because of the adverse effects that Defendant's employment practices have had on them individually and as a group.

260.    The employment practices described in this Class and Collective Action Complaint are part of Defendant's normal course of conduct.

261.    The claims brought pursuant to the NYLL may be pursued by all similarly situated persons who do not opt out of the NY Unequal Pay Class, pursuant to FRCP 23.

## II.    NUMEROSITY AND IMPRACTICABILITY OF JOINDER

262.    The members of the NY Unequal Pay Class are so numerous that joinder of all members is impracticable.

263.    While the exact number of the members of the NY Unequal Pay Class are unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are approximately 2,500 members of the NY Unequal Pay Class.

264.    Therefore, the numerosity requirement of FRCP 23(a) is satisfied.

## III.    COMMON QUESTIONS OF LAW AND FACT

265.    Common questions of law and fact, the answers to which will meaningfully advance this litigation, exist as to the NY Unequal Pay Class, and predominate over any questions only affecting the members of the NY Unequal Pay Class individually.

266.    Indeed, there are few, if any, purely individual issues in this action.

31

267.    The questions of law and fact that are common to Plaintiff and the NY Unequal Pay Class include, but are not limited to:

(a)    Whether Corning pays different wages to male and female Professionals within the State of New York;

(b)    Whether the male and female Professionals perform equal work on jobs requiring equal skill, efforts, and responsibility;

(c)    Whether the male and female Professionals' jobs are performed under similar working conditions; and

(d)    Whether Plaintiff and the NY Unequal Pay Class are entitled to liquidated damages and injunctive relief.

268.    Therefore, the common question requirement of FRCP 23(a) is satisfied.

## IV.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT

269.    Plaintiff's claims are typical of the claims of the members of the NY Unequal Pay Class she seeks to represent.

270.    Plaintiff and the members of the NY Unequal Pay Class work, or have worked, for Defendant and are, or were, subject to the same employment policies and practices.

271.    Plaintiff and the NY Unequal Pay Class all allege that they were each subjected to unlawful discrimination insofar as they were paid less than their male counterparts, despite performing equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility.

272.    The discriminatory employment practices suffered by Plaintiff, and the damages resulting therefrom, are sadly typical of Defendant's treatment of female Professionals generally, and of the NY Unequal Pay Class specifically.

32

273.    Therefore, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

274.    Plaintiff will fairly and adequately protect the interests of the NY Unequal Pay Class because her interests are coextensive and aligned with those of the members of the NY Unequal Pay Class.

275.    Plaintiff has no interests adverse to the NY Unequal Pay Class she seeks to represent and has retained competent and experienced counsel.

276.    Plaintiff is willing and able to represent the NY Unequal Pay Class as fairly and vigorously as she pursues her similar individual claims.

277.    Plaintiff has retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the demands necessary to litigate a class action of this size and complexity.

278.    The combined interests, experience, and resources of Plaintiff and her counsel to competently litigate the individual and NY Unequal Pay Class claims at issue in the instant action satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)(1)

279.    Without certification of the NY Unequal Pay Class, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

280.    Accordingly, certification of the NY Unequal Pay Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the NY Unequal Pay Class, and Defendant.

281.    By filing this Class and Collective Action Complaint, Plaintiff is preserving the

rights of the members of the NY Unequal Pay Class with respect to the statute of limitations on their claims.

282.    Therefore, not certifying a class would substantially impair and/or impede the remaining members of the NY Unequal Pay Class' ability to protect their interests.

## VII.    REQUIREMENTS OF RULE 23(b)(2)

283.    Defendant acted on grounds, described herein, generally applicable to Plaintiff and the NY Unequal Pay Class by discriminating against Plaintiff and the NY Unequal Pay Class in their compensation.

284.    These acts are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiff and the NY Unequal Pay Class as a whole.

285.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding Defendant's discriminatory practices with respect to the Plaintiff and the NY Unequal Pay Class.

286.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiff, and the NY Unequal Pay Class' entitlement to monetary and non-monetary remedies for the unlawful employment practices alleged herein.

287.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

## VIII.    REQUIREMENTS OF RULE 23(b)(3)

288.    The common issues of fact and law affecting Plaintiff's claims and those of the NY Unequal Pay Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

289.    A class action is superior to other available means for the fair and efficient

adjudication of Plaintiff's claims and the claims of the NY Unequal Pay Class.

290.    The cost of proving Defendant's pattern and practice of discriminating against female Professionals makes it impractical for the members of the NY Unequal Pay Class to pursue their claims individually.

291.    The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of all members of the NY Unequal Pay Class (they must be women who have worked for Defendant as Professionals within the State of New York during the statute of limitations period), as well as the common questions of law and fact described herein.

## CLASS ACTION ALLEGATIONS – RACE DISCRIMINATION

292.    Plaintiff brings her Third and Fourth Causes of Action as a class action under Title VII and Section 1981, as well as applicable regulations thereunder.

293.    Plaintiff brings her Fifth Cause of Action as a class action under the NYSHRL, as well as applicable regulations thereunder.

## I.    CLASS DEFINITION

294.    Plaintiff seeks to maintain claims, pursuant to FRCP 23, on behalf of herself and a class of all other similarly situated persons who are Black and/or African-American and have been, are now, or will be employed by Defendant as Professionals within the United States at any time during the full statute of limitations period, up to and including the date of any judgment in this action (the "Race Discrimination Class").

295.    Plaintiff also seeks to maintain claims, pursuant to FRCP 23, on behalf of herself and a subclass of all other similarly situated persons who are Black and/or African-American and have been employed by Defendant as Professionals within the State of New York at any time

during the full statute of limitations period, up to and including the date of any judgment in this action (the "NY Race Discrimination Subclass").

296.    Plaintiff alleges on behalf of herself and the Race Discrimination Class that Defendant violated, *inter alia*, Title VII and Section 1981 by discriminating against Black and/or African-American Professionals in the terms and conditions of their employment, including, without limitation, hiring, compensation, and promotion.

297.    Plaintiff further alleges on behalf of herself and the NY Race Discrimination Subclass that Defendant violated, *inter alia*, the NYSHRL by discriminating against Black and/or African-American Professionals in the terms and conditions of their employment, including, without limitation, hiring, compensation, and promotion.

298.    Plaintiff, the Race Discrimination Class, and the NY Race Discrimination Subclass have standing to seek such relief because of the adverse effects that Defendant's employment practices have had on them individually and as a group.

299.    The employment practices described in this Class and Collective Action Complaint are part of Defendant's normal course of conduct.

300.    The claims brought pursuant to the Title VII and Section 1981 may be pursued by all similarly situated persons who do not opt out of the Race Discrimination Class, pursuant to FRCP 23.

301.    The claims brought pursuant to the NYSHRL may be pursued by all similarly situated persons who do not opt out of the NY Race Discrimination Subclass, pursuant to FRCP 23.

## II.    <u>NUMEROSITY AND IMPRACTICABILITY OF JOINDER</u>

302.    The members of the Race Discrimination Class and the NY Race Discrimination

Subclass are so numerous that joinder of all members is impracticable.

303.    While the exact number of the members of the Race Discrimination Class are unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are approximately 750 members of the Race Discrimination Class.

304.    While the exact number of the members of the NY Race Discrimination Subclass are unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are approximately 500 members of the NY Race Discrimination Subclass.

305.    Therefore, the numerosity requirement of FRCP 23(a) is satisfied.

III.    **COMMON QUESTIONS OF LAW AND FACT**

306.    Common questions of law and fact, the answers to which will meaningfully advance this litigation, exist as to the Race Discrimination Class and NY Race Discrimination Subclass and predominate over any questions only affecting the members of the Race Discrimination Class or NY Race Discrimination Subclass individually.

307.    Indeed, there are few, if any, purely individual issues in this action.

308.    The questions of law and fact that are common to Plaintiff and the Race Discrimination Class and NY Race Discrimination Subclass include, but are not limited to:

(a)    Whether Defendant disproportionately placed Black Professionals in non-traditional roles as compared to their non-Black peers;

(b)    Whether Defendant had a policy of rounding down the overall performance review scores of Black Professionals while rounding up the scores of their non-Black peers;

(c)    Whether Defendant disproportionately gave Black Professionals lower performance review scores as compared to their non-Black peers;

(d)    Whether Defendant provided fewer opportunities for promotions and raises

37

to Black Professionals as compared to their non-Black peers;

        (e)    Whether Defendants discriminated against Black Professionals in the terms and conditions on their employment; and

        (f)    Whether Plaintiff, the Race Discrimination Class, and the NY Race Discrimination Subclass are entitled to liquidated damages and injunctive relief.

309.    Therefore, the common question requirement of FRCP 23(a) is satisfied.

## IV.    **TYPICALITY OF CLAIMS AND RELIEF SOUGHT**

310.    Plaintiff's claims are typical of the claims of the members of the Race Discrimination Class and NY Race Discrimination Subclass she seeks to represent.

311.    Plaintiff, the members of the Race Discrimination Class, and the members of the NY Race Discrimination Subclass work, have worked, or will work for Defendant and are, were, or will be subject to the same employment policies and practices.

312.    Plaintiff, the Race Discrimination Class, and the NY Race Discrimination Subclass all allege that they were each subjected to unlawful discrimination in the terms and conditions of their employment, including hiring, compensation, and promotion.

313.    The discriminatory employment practices suffered by Plaintiff, and the damages resulting therefrom, are sadly typical of Defendant's treatment of Black and/or African-American Professionals generally, and of the Race Discrimination Class and NY Race Discrimination Subclass specifically.

314.    Therefore, the typicality requirement of FRCP 23(a) is satisfied.

## V.    **ADEQUACY OF REPRESENTATION**

315.    Plaintiff will fairly and adequately protect the interests of the Race Discrimination Class and NY Race Discrimination Subclass because her interests are coextensive and aligned with

those of the members of the Race Discrimination Class and NY Race Discrimination Subclass.

316.    Plaintiff has no interests adverse to the Race Discrimination Class or NY Race Discrimination Subclass she seeks to represent and has retained competent and experienced counsel.

317.    Plaintiff is willing and able to represent the Race Discrimination Class and NY Race Discrimination Subclass as fairly and vigorously as she pursues her similar individual claims.

318.    Plaintiff has retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the demands necessary to litigate a class action of this size and complexity.

319.    The combined interests, experience, and resources of Plaintiff and her counsel to competently litigate the individual, Race Discrimination Class, and NY Race Discrimination Subclass claims at issue in the instant action satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)(1)

320.    Without certification of the Race Discrimination Class and NY Race Discrimination Subclass, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

321.    Accordingly, certification of the Race Discrimination Class and NY Race Discrimination Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the Race Discrimination Class, the NY Race Discrimination Subclass, and Defendant.

322.    By filing this Class and Collective Action Complaint, Plaintiff is preserving the

rights of the Race Discrimination Class and NY Race Discrimination Subclass with respect to the statute of limitations on their claims.

323.    Therefore, not certifying a class would substantially impair and/or impede the remaining members of the Race Discrimination Class' and NY Race Discrimination Subclass' ability to protect their interests.

## VII.    REQUIREMENTS OF RULE 23(b)(2)

324.    Defendant acted on grounds, described herein, generally applicable to Plaintiff, the Race Discrimination Class, and the NY Race Discrimination Subclass by discriminating against Plaintiff, the Race Discrimination Class, and the NY Race Discrimination Subclass in the terms and conditions of their employment, including, without limitation, hiring, compensation, and promotion.

325.    These acts are not sporadic or isolated, and support the request for final injunctive and declaratory relief with respect to Plaintiff, the Race Discrimination Class, and the NY Race Discrimination Subclass as a whole.

326.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding Defendant's discriminatory practices with respect to the Plaintiff, the Race Discrimination Class, and the NY Race Discrimination Subclass.

327.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiff, the Race Discrimination Class, and the NY Race Discrimination Subclass' entitlement to monetary and non-monetary remedies for the unlawful employment practices alleged herein.

328.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

## VIII.    REQUIREMENTS OF RULE 23(b)(3)

329.    The common issues of fact and law affecting Plaintiff's claims and those of the Race Discrimination Class and NY Race Discrimination Subclass, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

330.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiff's claims and the claims of the Race Discrimination Class and NY Race Discrimination Subclass.

331.    The cost of proving Defendant's pattern and practice of discriminating against Black and/or African-American Professionals makes it impractical for the members of the Race Discrimination Class and NY Race Discrimination Subclass to pursue their claims individually.

332.    The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of all members of the Race Discrimination Class (they must be Black and/or African-American people who have worked for Defendant as Professionals within the United States during the statute of limitations period) and the NY Race Discrimination Subclass Class (they must be Black and/or African-American people who have worked for Defendant as Professionals within the State of New York during the statute of limitations period), as well as the common questions of law and fact described herein.

### CLASS ACTION ALLEGATIONS – GENDER DISCRIMINATION

333.    Plaintiff brings her Sixth Cause of Action as a class action under Title VII, as well as applicable regulations thereunder.

334.    Plaintiff brings her Seventh Cause of Action as a class action under the NYSHRL, as well as applicable regulations thereunder.

41

## I.    CLASS DEFINITION

335.    Plaintiff seeks to maintain claims, pursuant to FRCP 23, on behalf of herself and a class of all other similarly situated persons who are women who have been, are now, or will be employed by Defendant as Professionals within the United States at any time during the full statute of limitations period, up to and including the date of any judgment in this action (the "Gender Discrimination Class").

336.    Plaintiff also seeks to maintain claims, pursuant to FRCP 23, on behalf of herself and a subclass of all other similarly situated persons who are women have been, are now, or will be employed by Defendant as Professionals within the State of New York at any time during the full statute of limitations period, up to and including the date of any judgment in this action (the "NY Gender Discrimination Subclass").

337.    Plaintiff alleges on behalf of herself and the Gender Discrimination Class that Defendant violated, *inter alia*, Title VII by discriminating against female Professionals in the terms and conditions of their employment, including, without limitation, hiring, compensation, and promotion.

338.    Plaintiff further alleges on behalf of herself and the NY Gender Discrimination Subclass that Defendant violated, *inter alia*, the NYSHRL by discriminating against female Professionals in the terms and conditions of their employment, including, without limitation, hiring, compensation, and promotion.

339.    Plaintiff, the Gender Discrimination Class, and the NY Gender Discrimination Subclass have standing to seek such relief because of the adverse effects that Defendant's employment practices have had on them individually and as a group.

340.    The employment practices described in this Class and Collective Action Complaint

are part of Defendant's normal course of conduct.

341.    Pursuant to FRCP 23, the claims brought pursuant to the Title VII may be pursued by all similarly situated persons who do not opt out of the Gender Discrimination Class.

342.    Pursuant to FRCP 23, the claims brought pursuant to the NYSHRL may be pursued by all similarly situated persons who do not opt out of the NY Gender Discrimination Subclass.

## II.    NUMEROSITY AND IMPRACTICABILITY OF JOINDER

343.    The members of the Gender Discrimination Class and the NY Gender Discrimination Subclass are so numerous that joinder of all members is impracticable.

344.    While the exact number of the members of the Gender Discrimination Class are unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are approximately 4,000 members of the Gender Discrimination Class.

345.    While the exact number of the members of the NY Gender Discrimination Subclass are unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are approximately 2,500 members of the NY Gender Discrimination Subclass.

346.    Therefore, the numerosity requirement of FRCP 23(a) is satisfied.

## III.    COMMON QUESTIONS OF LAW AND FACT

347.    Common questions of law and fact, the answers to which will meaningfully advance this litigation, exist as to the Gender Discrimination Class and NY Gender Discrimination Subclass, and predominate over any questions only affecting the members of the Gender Discrimination Class or NY Gender Discrimination Subclass individually.

348.    Indeed, there are few, if any, purely individual issues in this action.

349.    The questions of law and fact that are common to Plaintiff, the Gender

Discrimination Class, and the NY Gender Discrimination Subclass include, but are not limited to:

(a)    Whether Defendant disproportionately gave female Professionals lower performance review scores as compared to their male peers;

(b)    Whether Defendant provided fewer opportunities for promotions and raises to female Professionals as compared to their male peers;

(c)    Whether Defendant discriminated against female Professionals in the terms and conditions on their employment; and

(d)    Whether Plaintiff, the Gender Discrimination Class, and the NY Gender Discrimination Subclass are entitled to liquidated damages and injunctive relief.

350.    Therefore, the common question requirement of FRCP 23(a) is satisfied.

## IV.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT

351.    Plaintiff's claims are typical of the claims of the members of the Gender Discrimination Class and NY Gender Discrimination Subclass she seeks to represent.

352.    Plaintiff, the members of the Gender Discrimination Class, and the members of the NY Gender Discrimination Subclass work, have worked, or will work for Defendant and are, were, or will be subject to the same employment policies and practices.

353.    Plaintiff, the Gender Discrimination Class, and the NY Gender Discrimination Subclass all allege that they were each subjected to unlawful discrimination in the terms and conditions of their employment, including hiring, compensation, and promotion.

354.    The discriminatory employment practices suffered by Plaintiff, and the damages resulting therefrom, are sadly typical of Defendant's treatment of female Professionals generally, and of the Gender Discrimination Class and NY Gender Discrimination Subclass specifically.

355.    Therefore, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

356.    Plaintiff will fairly and adequately protect the interests of the Gender Discrimination Class and NY Gender Discrimination Subclass because her interests are coextensive and aligned with those of the members of the Gender Discrimination Class and the NY Gender Discrimination Subclass.

357.    Plaintiff has no interests adverse to the Gender Discrimination Class or NY Gender Discrimination Subclass she seeks to represent and has retained competent and experienced counsel.

358.    Plaintiff is willing and able to represent the Gender Discrimination Class and the NY Gender Discrimination Subclass as fairly and vigorously as she pursues her similar individual claims.

359.    Plaintiff has retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the demands necessary to litigate a class action of this size and complexity.

360.    The combined interests, experience, and resources of Plaintiff and her counsel to competently litigate the individual, Gender Discrimination Class, and NY Gender Discrimination Subclass claims at issue in the instant action satisfies the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)(1)

361.    Without certification of the Gender Discrimination Class and NY Gender Discrimination Subclass, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

362.     Accordingly, certification of the Gender Discrimination Class and NY Gender Discrimination Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the Gender Discrimination Class, the NY Gender Discrimination Subclass, and Defendant.

363.     By filing this Class and Collective Action Complaint, Plaintiff is preserving the rights of the Gender Discrimination Class and NY Gender Discrimination Subclass with respect to the statute of limitations on their claims.

364.     Therefore, not certifying a class would substantially impair and/or impede the remaining members of the Gender Discrimination Class' and NY Gender Discrimination Subclass' ability to protect their interests.

## VII.     REQUIREMENTS OF RULE 23(b)(2)

365.     Defendant acted on grounds, described herein, generally applicable to Plaintiff, the Gender Discrimination Class, and the NY Gender Discrimination Subclass by discriminating against Plaintiff, the Gender Discrimination Class, and the NY Gender Discrimination Subclass in the terms and conditions of their employment, including, without limitation, hiring, compensation, and promotion.

366.     These acts are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiff, the Gender Discrimination Class, and the NY Gender Discrimination Subclass as a whole.

367.     Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding Defendant's discriminatory practices with respect to the Plaintiff, the Gender Discrimination Class, and the NY Gender Discrimination Subclass.

368.     Declaratory and injunctive relief are the factual and legal predicates for Plaintiff,

the Gender Discrimination Class, and the NY Gender Discrimination Subclass' entitlement to monetary and non-monetary remedies for the unlawful employment practices alleged herein.

369.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

## VIII.    REQUIREMENTS OF RULE 23(b)(3)

370.    The common issues of fact and law affecting Plaintiff's claims and those of the Gender Discrimination Class and NY Gender Discrimination Subclass, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

371.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiff's claims and the claims of the Gender Discrimination Class and NY Gender Discrimination Subclass.

372.    The cost of proving Defendant's pattern and practice of discriminating against female Professionals makes it impractical for the members of the Gender Discrimination Class and NY Gender Discrimination Subclass to pursue their claims individually.

373.    The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of all members of the Gender Discrimination Class (they must be women who have worked Defendant as Professionals within the United States during the statute of limitations period) and the NY Gender Discrimination Subclass (they must be women who have worked for Defendants as Professionals within the State of New York during the statute of limitations period), as well as the common questions of law and fact described herein.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE EPA: UNEQUAL PAY BASED ON GENDER**
*(On Behalf of the EPA Collective)*

374.     Plaintiff, on behalf of herself and the EPA Collective, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

375.     During the full statutory period, Plaintiff and the EPA Collective were subject to the provisions of the EPA.

376.     During the full statutory period, Plaintiff and the EPA Collective performed equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility as compared to their male counterparts.

377.     Despite this, Defendant paid Plaintiff and the EPA Collective at a rate of pay lower than that of their male counterparts.

378.     This pay differential was not the result of a seniority system, merit system, system which measures earnings by quantity or quality of production, or any factor other than sex.

379.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the EPA, Plaintiff and the EPA Collective have suffered, and continue to suffer, monetary and/or economic harm, including, *inter alia*, loss of future income, compensation, and benefits for which they are entitled to an award of damages.

380.     Plaintiff and the EPA Collective are further entitled to an award of liquidated damages, as well as reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: UNEQUAL PAY BASED ON GENDER**
*(On Behalf of the NY Unequal Pay Class)*

381.     Plaintiff, on behalf of herself and the NY Unequal Pay Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

48

382.    During the full statutory period, Plaintiff and the NY Unequal Pay Class were subject to the provisions of the NYLL, including NYLL § 194.

383.    During the full statutory period, Plaintiff and the NY Unequal Pay Class performed equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility as compared to their male counterparts.

384.    Despite this, Defendant paid Plaintiff and the NY Unequal Pay Class at a rate of pay lower than that of their male counterparts.

385.    This pay differential was not the result of a seniority system, merit system, system which measures earnings by quantity or quality of production, or any factor other than sex.

386.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYLL, including NYLL § 194, Plaintiff and the NY Unequal Pay Class have suffered, and continue to suffer, monetary and/or economic harm, including, *inter alia*, loss of future income, compensation, and benefits for which they are entitled to an award of damages.

387.    Plaintiff and the NY Unequal Pay Class are further entitled to an award of liquidated damages, as well as reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF TITLE VII: RACE AND/OR COLOR DISCRIMINATION
#### (*On Behalf of the Race Discrimination Class*)

388.    Plaintiff, on behalf of herself and the Race Discrimination Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

389.    By the actions described above, among others, Defendant has discriminated against Plaintiff and the Race Discrimination Class on the basis of their race and/or color in violation of Title VII by denying them the same terms and conditions of employment available to non-Black employees, including, *inter alia*, hiring, compensation, and promotion.

49

390.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff and the Race Discrimination Class have suffered, and continue to suffer, monetary and/or economic harm, including, *inter alia*, loss of future income, compensation, and benefits for which they are entitled to an award of damages.

391.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff and the Race Discrimination Class have suffered, and continue to suffer, emotional distress for which they are entitled to an award of compensatory damages.

392.    Defendant's unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff and the Race Discrimination Class' rights under Title VII, for which Plaintiff and the Race Discrimination Class are entitled to an award of punitive damages.

393.    Plaintiff and the Race Discrimination Class are further entitled to an award of reasonable attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
### VIOLATIONS OF SECTION 1981: RACE AND/OR COLOR DISCRIMINATION
#### (*On Behalf of the Race Discrimination Class*)

394.    Plaintiff, on behalf of herself and the Race Discrimination Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

395.    By the actions described above, among others, Defendant has discriminated against Plaintiff and the Race Discrimination Class on the basis of their race and/or color in violation of Section 1981 by denying them the same terms and conditions of employment available to non-Black employees, including, *inter alia*, hiring, compensation, and promotion.

396.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff and the Race Discrimination Class have suffered, and continue

to suffer, monetary and/or economic harm, including, *inter alia*, loss of future income, compensation, and benefits for which they are entitled to an award of damages.

397.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff and the Race Discrimination Class have suffered, and continue to suffer, emotional distress for which they are entitled to an award of compensatory damages.

398.    Defendant's unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff and the Race Discrimination Class' rights under Section 1981, for which Plaintiff and the Race Discrimination Class are entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYSHRL: RACE AND/OR COLOR DISCRIMINATION**
***(On Behalf of the NY Race Discrimination Subclass)***

399.    Plaintiff, on behalf of herself and the NY Race Discrimination Subclass, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

400.    By the actions described above, among others, Defendant has discriminated against Plaintiff and the NY Race Discrimination Subclass on the basis of their race and/or color in violation of the NYSHRL by denying them the same terms and conditions of employment available to non-Black employees, including, *inter alia*, hiring, compensation, and promotion.

401.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff and the NY Race Discrimination Subclass have suffered, and continue to suffer, monetary and/or economic harm, including, *inter alia*, loss of future income, compensation, and benefits for which they are entitled to an award of damages.

402.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff and the NY Race Discrimination Subclass have suffered, and

continue to suffer, emotional distress for which they are entitled to an award of compensatory damages.

403.    Defendant's unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff and the NY Race Discrimination Subclass' rights under the NYSHRL, for which Plaintiff and the NY Race Discrimination Subclass are entitled to an award of punitive damages.

### SIXTH CAUSE OF ACTION
### VIOLATIONS OF TITLE VII: GENDER DISCRIMINATION
#### (*On Behalf of the Gender Discrimination Class*)

404.    Plaintiff, on behalf of herself and the Gender Discrimination Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

405.    By the actions described above, among others, Defendant has discriminated against Plaintiff and the Gender Discrimination Class on the basis of their sex in violation of Title VII by denying them the same terms and conditions of employment available to male employees, including, *inter alia*, hiring, compensation, and promotion.

406.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff and the Gender Discrimination Class have suffered, and continue to suffer, monetary and/or economic harm, including, *inter alia*, loss of future income, compensation, and benefits for which they are entitled to an award of damages.

407.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff and the Gender Discrimination Class have suffered, and continue to suffer, emotional distress for which they are entitled to an award of compensatory damages.

408.    Defendant's unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff and the

Gender Discrimination Class' rights under Title VII, for which Plaintiff and the Gender Discrimination Class are entitled to an award of punitive damages.

409.    Plaintiff and the Gender Discrimination Class are further entitled to an award of reasonable attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYSHRL: GENDER DISCRIMINATION**
***(On Behalf of the NY Gender Discrimination Subclass)***

410.    Plaintiff, on behalf of herself and the NY Gender Discrimination Subclass, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

411.    By the actions described above, among others, Defendant has discriminated against Plaintiff and the NY Gender Discrimination Subclass on the basis of their sex in violation of the NYSHRL by denying them the same terms and conditions of employment available to male employees, including, *inter alia*, hiring, compensation, and promotion.

412.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff and the NY Gender Discrimination Subclass have suffered, and continue to suffer, monetary and/or economic harm, including, *inter alia*, loss of future income, compensation, and benefits for which they are entitled to an award of damages.

413.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff and the NY Gender Discrimination Subclass have suffered, and continue to suffer, emotional distress for which they are entitled to an award of compensatory damages.

414.    Defendant's unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff and the NY Gender Discrimination Subclass' rights under the NYSHRL, for which Plaintiff and the NY

Gender Discrimination Subclass are entitled to an award of punitive damages.

415.    Plaintiff and the NY Gender Discrimination Subclass are further entitled to an award of reasonable attorneys' fees and costs.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF TITLE VII: RETALIATION**
***(On Behalf of Plaintiff Yulonda Woods-Early Individually)***

416.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

417.    As set forth above, Plaintiff made multiple protected complaints to Defendant regarding discrimination on the basis of race, color, and sex.

418.    Additionally, Plaintiff engaged in protected activity by, *inter alia*, recording her March 6, 2015 performance review to document discrimination on the basis of race, color, and sex.

419.    Defendant retaliated against Plaintiff for her protected activity by, *inter alia*, interfering with her efforts to find alternative employment with Defendant and ultimately terminating her employment.

420.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, *inter alia*, loss of future income, compensation, and benefits for which she is entitled to an award of damages.

421.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

422.    Defendant's unlawful and retaliatory actions were intentional, done with malice,

and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

423.    Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

### NINTH CAUSE OF ACTION
### VIOLATIONS OF SECTION 1981: RETALIATION
*(On Behalf of Plaintiff Yulonda Woods-Early Individually)*

424.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

425.    As set forth above, Plaintiff made multiple protected complaints to Defendant regarding discrimination on the basis of race and color.

426.    Additionally, Plaintiff engaged in protected activity by, *inter alia*, recording her March 6, 2015 performance review to document discrimination on the basis of race and color.

427.    Defendant retaliated against Plaintiff for her protected activity by, *inter alia*, interfering with her efforts to find alternative employment with Defendant and ultimately terminating her employment.

428.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, *inter alia*, loss of future income, compensation, and benefits for which she is entitled to an award of damages.

429.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

430.    Defendant's unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under

Title VII, for which Plaintiff is entitled to an award of punitive damages.

## TENTH CAUSE OF ACTION
## VIOLATIONS OF THE NYSHRL: RETALIATION
### *(On Behalf of Plaintiff Yulonda Woods-Early Individually)*

431.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

432.    As set forth above, Plaintiff made multiple protected complaints to Defendant regarding discrimination on the basis of race, color, and sex.

433.    Additionally, Plaintiff engaged in protected activity by, *inter alia*, recording her March 6, 2015 performance review to document discrimination on the basis of race, color, and sex.

434.    Defendant retaliated against Plaintiff for her protected activity by, *inter alia*, interfering with her efforts to find alternative employment with Defendant and ultimately terminating her employment.

435.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, *inter alia*, loss of future income, compensation, and benefits for which she is entitled to an award of damages.

436.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

437.    Defendant's unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

438.    Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself, the Race Discrimination Class, the NY Race Discrimination Subclass, the Gender Discrimination Class, the NY Gender Discrimination Subclass, and the NY Unequal Pay Class (collectively, the "Classes"), as well as the EPA Collective, respectfully requests that this Court:

A.    Declare that the practices complained of herein are unlawful under applicable federal and State law;

B.    Grant an injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.    Declare this action to be maintainable as a collective action pursuant to 29 U.S.C. § 216(b), and direct Defendant to provide Plaintiff with a list of all members of the EPA Collective, including all last known addresses, telephone numbers, and email addresses of each such person, so Plaintiff can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

D.    Declare this action to be maintainable as a class action pursuant to FRCP 23, and direct Defendant to provide Plaintiff with a list of all members of the Classes, including all last known addresses, telephone numbers, and email addresses of each such person, so that Plaintiff can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

E.    Designate Plaintiff Dr. Yulonda Woods-Early as a representative of the Classes, and her counsel of record as class counsel;

F.    Determine the damages sustained by Plaintiff, the EPA Collective, and the Classes

as a result of Defendant's violations of Title VII, Section 1981, the NYSHRL, the EPA, and the

NYLL, and award those damages against Defendant and in favor of Plaintiff, the EPA Collective,

and the Classes, plus such pre-judgment and post-judgment interest as may be allowed by law;

G.    Award Plaintiff, the EPA Collective, and the Classes an additional equal amount as

liquidated damages because Defendant's violations were willful and/or without a good faith basis;

H.    Award Plaintiff, the EPA Collective, and the Classes their reasonable attorneys'

fees and costs and disbursements in this action including, but not limited to, any accountants' or

experts' fees; and

I.    Grant Plaintiff, the EPA Collective, and the Classes such other and further relief

that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself, the EPA Collective, the Race Discrimination Class, the NY

Race Discrimination Subclass, the Gender Discrimination Class, the NY Gender Discrimination

Subclass, and the NY Unequal Pay Class, hereby demands a trial by jury on all issues of fact and

damages.

Dated: February 23, 2018                    **FARUQI & FARUQI, LLP**

By:    */s/ Innessa M. Huot*
     Innessa Melamed Huot

685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
ihuot@faruqilaw.com

*Attorneys for Plaintiff, the Proposed EPA*
*Collective, and the Proposed Classes*