UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

YULONDA WOODS-EARLY,

                                                    Plaintiff,

                                                                                Case # 18-CV-6162-FPG

v.

                                                                                DECISION AND ORDER

CORNING INCORPORATED,

                                                     Defendant.

## INTRODUCTION

Plaintiff Yulonda Woods-Early brings this employment discrimination action against Defendant Corning Incorporated. She alleges that Defendant engaged in race and color discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"). ECF No. 16. Plaintiff seeks to certify nationwide and statewide classes on these claims. Plaintiff also brings individual retaliation claims pursuant to those same state and federal provisions. Now before the Court is Defendant's motion to dismiss, which primarily concerns Plaintiff's class claims. ECF No. 18. Plaintiff opposes the motion. ECF No. 20. For the following reasons, Defendant's motion is DENIED.

## BACKGROUND

The following facts are from the amended complaint, unless otherwise noted. Corning is a "multinational technology company specializing in designing and manufacturing materials for industrial and scientific applications." ECF No. 16 ¶ 20. Plaintiff, who is "Black and African-

American," worked as a marketing consultant for Corning between August 2007 and December 2015. *Id.* ¶¶ 80-83.

Broadly speaking, Plaintiff challenges Corning's performance evaluation process, alleging that it is "inaccurate and invalid" and has the effect of "systematically disadvantag[ing] Black Professionals." *Id.* ¶ 74. To provide some context, the Court first details Plaintiff's allegations surrounding Corning's evaluation process. The Court then discusses the allegations relevant to Plaintiff's time at Corning.

Corning's "Professional" workforce consists of "several thousand highly-educated employees who design, engineer, and conduct market research and strategy for the Company's products." *Id.* ¶ 23. Professional employees are placed in one of six pay bands—from lowest to highest paying, "A, B, C, D, F, and 88." *Id.* Some significant conditions of employment are based on pay-band placement. Pay bands not only "dictate [employees'] base salaries, but also their bonuses." *Id.* ¶ 68. In addition, employees placed in pay band "D" or above may take part in networking opportunities "with executives at Corning's highest levels." *Id.* ¶ 71. These include leadership classes with senior executives. Plaintiff alleges that such networking is an important criterion for succeeding at and advancing within Corning. *See id.* ¶ 73.

To be eligible for promotion to pay band "D," an employee must first be designated as "Emerging Talent." *Id.* ¶ 61. In turn, to be designated as "Emerging Talent," an employee must receive a final performance rating of 4 (out of a possible 5) in two consecutive yearly evaluations. *Id.* ¶ 62. A "1" means that the employee "failed to meet expectations"; a "4" means that the employee "exceeded expectations"; and a "5" means that the employee "far exceeded expectations." *Id.* ¶ 35.

The crux of Plaintiff's claim is that the process by which these annual performance ratings are determined is flawed, discriminatory, and has the effect of "undervalu[ing] Black Professionals." ECF No. 16 ¶ 30.

An employee's final performance rating—the one on which the "Emerging Talent" designation is determined—is putatively based on three subsidiary sets of ratings: Manager ratings, Participant ratings, and an Average rating. As to Manager rating, the employee's immediate supervisor completes an evaluation whereby he or she rates the employee on the 1 to 5 scale in seven categories, known collectively as "Corning Values": "(i) Quality; (ii) Integrity; (iii) Performance; (iv) Leadership; (v) Innovation; (vi) Independence; and (vii) Individual." *Id.* ¶ 31. The supervisor also provides an "overall rating." *Id.* ¶ 39.

Participant ratings are based on the same evaluation methodology as Manager ratings. Each employee identifies "approximately two to seven individuals for whom they have worked during the previous year" to complete the evaluations. *Id.* ¶ 43. The evaluations from these individuals are then combined to create an "overall Participant rating between 1 and 5." *Id.* ¶ 45. Then, the "Manager rating and overall Participant rating are combined" to produce the employee's "Average" rating. *Id.* ¶ 50.

There are some additional steps that are taken before a final rating is assigned. First, the employee's manager assigns a final rating. While the manager may consider the Manager, Participant, and Average ratings, the manager has "unfettered discretion to record any integer between 1 and 5 as the Final rating." *Id.* ¶ 55. Second, after the manager sets the employee's final rating, the director of the department reviews the rating. The director may approve or modify the final rating. Third, the director submits the final rating to a "small brain trust" consisting of "Executive Vice Presidents" and "Senior Vice Presidents," who are "ultimately responsible for

each of Corning's departments." ECF No. 16 ¶ 59. "This small brain trust controls the final determination of each Professional's Final rating and retains unfettered discretion to alter each Professional's Final rating." *Id.* ¶ 60. It is this group that determines employees' final performance ratings and thereby controls which employees are designated as "Emerging Talent."

Plaintiff challenges the performance evaluation process at all levels. As an initial matter, Plaintiff questions the evaluation methodology itself, arguing that the "Corning Values" on which ratings are based are amorphous and meaningless. She alleges that Corning does not give evaluators specific training or instructions on how to apply and weigh the seven categories. Thus, evaluations are "untethered from any valid performance metric for evaluating Professionals." *Id.* ¶ 42.

Plaintiff's central claim, however, is that the evaluation process is infected by racial bias. Plaintiff alleges that Corning has "fostered a culture of discrimination and a racially hostile environment within its workplace, where degrading terms such as 'gorilla' and even the 'n-word' are routinely used to refer to Black Professionals and other Black employees within the Company." *Id.* ¶ 6. This pervasive discrimination impacts the performance evaluation process, which is largely controlled by "non-Black" supervisors and executives. *Id.* ¶ 65. Specifically, supervisors and executives can use the discretion afforded to them in the evaluation process to "promot[e] non-Black Professionals . . . [and] ensur[e] that Black Professionals are disproportionately compensated within the lowest three [pay bands]." *Id.* ¶ 2.

Plaintiff provides some examples. Supervisors can manipulate Participant ratings because they have "unlimited discretion to add or remove Participants, increase or decrease the total number of individuals each Professional must identify as potential Participants, disregard some or all of a Professional's Participant ratings entirely, and even change Participants' ratings or contact

4

Participants directly to convince them to change their ratings." ECF No. 16 ¶ 49. Similarly, supervisors have "unfettered discretion" to set Average and Final ratings notwithstanding the Manager and Participant ratings. *Id.* ¶¶ 52-55.

Perhaps most importantly, Plaintiff alleges that the executive "brain trust" who controls performance ratings has "unfettered discretion to alter each Professional's Final rating." *Id.* ¶ 60. This group not only has the ability to manipulate ratings; Plaintiff alleges that it has the incentive to do so. Corning has a policy that only 10% of its Professional employees may be designated as "Emerging Talent." *Id.* ¶ 3. This rule compels the "brain trust" to change final ratings so as to "prevent too many Professionals from receiving Final ratings of 4" and "ensure that the 10% quota for Emerging Talent is met and not exceeded." *Id.* ¶¶ 63-64.

In sum, Plaintiff alleges that "this unreliable and invalid system carried out by a disproportionate number of non-Black executives creates inaccurate and biased outcomes that systematically disadvantage Black Professionals." *Id.* ¶ 74. Plaintiff claims that Corning's own data show that "the bulk of Black Professionals' [performance] ratings fell within the 1-3 range, whereas the bulk of non-Black Professionals received ratings in the 3-5 range." *Id.* ¶ 123.

The Court now turns to the allegations relevant to Plaintiff's time at Corning. Plaintiff breaks her individual allegations into two categories: those relating to the impact of the performance evaluation process on her, and those relating to retaliation she faced for raising complaints of discrimination based on race, color, and sex. For purposes of Defendant's motion, the Court need not describe the allegations in detail. Plaintiff alleges that, during her tenure, she only received final ratings of 3—and in some years, no final rating at all—despite "her raw numbers justifying a Final rating of at least 4." *Id.* ¶ 88. In addition, she claims that her direct supervisors manipulated the performance evaluation process to deflate her Participant ratings. As

to retaliation, Plaintiff alleges that, throughout her employment, she faced discriminatory conduct and comments from her supervisors and that Corning terminated her when she engaged in protected activity to respond to such discrimination.

Plaintiff brought this action in February 2018. After Defendant filed a motion to dismiss, Plaintiff amended her complaint. Plaintiff now raises the following claims: (1) a disparate impact claim under Title VII; (2) a disparate treatment claim under Title VII; (3) a disparate treatment claim under Section 1981; (4) a disparate impact claim under the NYSHRL; (5) a disparate treatment claim under the NYSHRL; (6) a retaliation claim under Title VII; (7) a retaliation claim under Section 1981; and (8) a retaliation claim under the NYSHRL. Plaintiff seeks to certify a nationwide class under Federal Rule of Civil Procedure 23 for the first, second, and third claims, which she presently defines as follows:

> [A]ll . . . similarly situated persons who are Black and/or African-American, and have been, are now, or will be employed by Defendant as Professionals within the United States and placed in pay bands "A," "B," and/or "C" at any time during the full statute of limitations period, up to and including the date of any judgment in this action.

ECF No. 16 ¶ 189. Plaintiff also seeks to certify a statewide class for the fourth and fifth claims, which is similarly defined except that it would consist of only employees employed within New York. *See id.* ¶ 190. She estimates that there are approximately 500 members in the proposed nationwide class and 375 members in the proposed statewide class. *See id.* ¶¶ 198, 199.

## DISCUSSION

Defendant has filed a motion to dismiss under Rule 12(b)(6), requesting that the Court dismiss Plaintiff's class allegations and all claims based on Defendant's alleged failure to promote Plaintiff. In support, Defendant argues that (1) the proposed classes lack commonality under Rule 23(a)(2); (2) the proposed classes cannot satisfy any of the three alternative conditions set forth in

6

Rule 23(b); and (3) Plaintiff has not sufficiently pleaded a claim based on Defendant's failure to promote her. The Court discusses each argument in turn.

A complaint will survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) when it states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A claim for relief is plausible when the plaintiff pleads sufficient facts that allow the Court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. In considering the plausibility of a claim, the Court must accept factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). At the same time, the Court is not required to accord "[l]egal conclusions, deductions, or opinions couched as factual allegations . . . a presumption of truthfulness." *In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

While it makes no substantive difference to the analysis, the Court notes that claims challenging the adequacy of class allegations are often evaluated under the rubric of Rule 12(f).[1] *See, e.g.*, *Guariglia v. Procter & Gamble Co.*, No. 15-cv-4307, 2018 WL 1335356, at *11 (E.D.N.Y. Mar. 14, 2018); *Davis v. Navient Corp.*, No. 17-cv-992, 2018 WL 1603871, at *4 (W.D.N.Y. Mar. 12, 2018). That rule permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[T]he standard applied is the 'mirror image' of the standard applied to a Rule 12(b)(6) motion." *Guariglia*, 2018 WL 1335356, at *11.

"Although class certification typically occurs at a later stage of the proceedings, a motion to strike class allegations is procedurally permissible at the pleading stage." *Davis*, 2018 WL

---

[1] Similarly, Defendant notes that courts have invoked Rule 23(d)(1)(D) as a means to strike class allegations at the pleading stage. *See* Fed. R. Civ. P. 23(d)(1)(D) (permitting a court to issue an order "requir[ing] that the pleadings be amended to eliminate allegations about representation of absent persons").

1603871, at *4 (internal quotation marks and brackets omitted). Nevertheless, such motions are disfavored and rarely granted because they require "a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 447 (E.D.N.Y. 2015). "Accordingly, to succeed on a motion to strike class allegations, a defendant must demonstrate from the face of the complaint that it would be impossible to certify the alleged class regardless of the facts the plaintiffs may be able to obtain during discovery." *Guariglia*, 2018 WL 1335356, at *11 (internal quotation marks omitted).

## I. Commonality

Defendant first argues that the class allegations are inadequate because the proposed classes lack commonality. Relying on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), Defendant contends that, as a general matter, employment-discrimination claims challenging managerial discretion do not satisfy the requirement that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Defendant disregards the allegations concerning the executive "brain trust"—calling such allegations conclusory and implausible—and asserts that Plaintiff is essentially challenging the discretion conferred on managers as part of the performance evaluation process. Plaintiff counters that the amended complaint "clearly alleges that [Defendant] maintains a common, discriminatory policy in which a small group of top executives assigns all Final ratings and ensures a forced distribution resulting in exactly 10% of Professionals being designated as 'Emerging Talent.'" ECF No. 20 at 24.

Rule 23(a) sets out four threshold requirements for certification:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The "failure to meet any one of Rule 23's requirements destroys the alleged class action." *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 69-70 (E.D.N.Y. 2000).

In *Dukes*, the Supreme Court clarified the requirement of commonality as it pertains to employment-discrimination claims. The *Dukes* court observed that the language of the rule is easy to misunderstand since "[a]ny competently crafted class complaint literally raises common 'questions.'" *Dukes*, 564 U.S. at 349. Instead, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* at 350.

Applying this logic, the Court held that a class of 1.5 million female Wal-Mart employees should not have been certified because commonality was lacking. The class alleged that "the discretion exercised by local supervisors over pay and promotion matters violates Title VII by discriminating against women." *Id.* at 342. The Court noted that the class "wish[ed] to sue about literally millions of employment decisions at once." *Id.* at 352. "Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* That glue can come in a few different forms. The Court explained that "if the employer used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy" the commonality requirement. *Id.* at 353

(internal quotation marks omitted). Similarly, "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes." *Id.*

The Court determined that the allegedly "common" policy of conferring discretion upon local supervisors did not suffice: "[o]n its face . . . that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices." *Id.* at 355. At the very least, such a claim would require proof of a "common mode of exercising discretion that pervades the entire company." *Id.* at 356. Because the plaintiffs could offer no such evidence, they had not established commonality. *See id.* at 359.

Contrary to Defendant's argument, *Dukes* does not require that Plaintiff's class allegations be stricken. Since *Dukes*, courts have found commonality in cases challenging discretionary employment decisions where such discretion is exercised uniformly by "upper-level, top-management personnel." *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 114 (4th Cir. 2013); *see also Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of Chicago*, 797 F.3d 426, 438 (7th Cir. 2015) ("[D]iscretionary decisions can be the source of a common claim if they are . . . the outcome of employment practices or policies controlled by higher-level directors . . . or if all decision-makers act together as one unit."). Because "discretionary authority exercised by high-level corporate decision-makers" is "applicable to a broad segment of the corporation's employees," it is "more likely to satisfy the commonality requirement." *Scott*, 733 F.3d at 114. This reasoning extends to discretionary decisions concerning pay and promotions: "if all pay and promotion decisions had to be vetted by a single decisionmaker, or a small, cohesive group, then

there might be a basis to argue that it is the performance of that function, by that decisionmaker, that constitutes the common practice among employees claiming disparate impact." *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.A.*, 34 F. Supp. 3d 896, 908 (N.D. Ill. 2014); *see also Kassman v. KPMG LLP*, No. 11 Civ. 3743, 2018 WL 6264835, at *19 (S.D.N.Y. Nov. 30, 2018); *Moussouris v. Microsoft Corp.*, No. C15-1483, 2018 WL 3328418, at *17 (W.D. Wash. June 25, 2018) (collecting cases). Indeed, the *Dukes* court noted that an adequate common contention is "the assertion of discriminatory bias on the part of the same supervisor." *Dukes*, 564 U.S. at 350.

Here, Plaintiff alleges that an executive "brain trust" has unfettered discretion to determine each employee's final rating. Not only that, this singular and cohesive group has an incentive to manipulate ratings—namely, to limit the number of employees who are designated as "Emerging Talent." Plaintiff also alleges that the manner in which this group exercises discretion has had the effect, if not the purpose, of barring Black and African-American professional employees from advancing to higher pay bands and thereby receiving additional pay, bonuses, and networking opportunities. These allegations provide the "glue" to bind the otherwise disparate pay-and-promotion decisions of potential class members. *Id.* at 352. At this early stage, the Court cannot conclude that "it would be impossible to certify" the proposed classes even after discovery. *Guariglia*, 2018 WL 1335356, at *11.

To be sure, the amended complaint appears to present a few diverging theories of liability. On the one hand, Plaintiff alleges that the executive brain trust controls the determination of final ratings and thus caused the injuries of which she complains. *See* ECF No. 16 ¶¶ 60-67, 90. In her opposition to the motion to dismiss, Plaintiff goes as far to say that the "discrete decisions and biases of individual middle managers" are not "even relevant." ECF No. 20 at 8. On the other

hand, and as Defendant points out, the amended complaint also challenges the discretion afforded to immediate supervisors under the performance evaluation process. *See, e.g.*, ECF No. 16 ¶¶ 40, 41, 49, 52, 55. Indeed, Plaintiff alleges in detail the ways in which her immediate supervisors manipulated the performance evaluation process to her detriment. *See, e.g.*, *id.* ¶¶ 88, 95-96, 99. These latter allegations seem to be premised on a claim that immediate supervisors did have some level of control or influence over the performance evaluation process.

Nevertheless, the Court cannot agree with Defendant that Plaintiff's allegations regarding the executive "brain trust" are so implausible that they must be disregarded. Plaintiff makes specific, coherent allegations concerning the existence of the "brain trust" and its role within Defendant's performance evaluation process. The Court can discern nothing facially implausible with a claim that a small group of executives controls the performance evaluation process for professional employees and sets final ratings with an eye towards limiting the pool of candidates for promotions and other employee benefits. Furthermore, assuming *arguendo* that the amended complaint sets forth inconsistent theories of liability, a "plaintiff is at liberty to plead different theories, even if they are inconsistent with one another, and the court must accept each sufficiently pleaded theory at face value, without regard to its inconsistency with other parts of the complaint."[2] *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) (citing Fed. R. Civ. P. 8(d)(3)); *see also Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999) (stating that the federal rules offer "sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party").

Accordingly, the Court will not strike the class allegations on the basis that it will be impossible for Plaintiff to demonstrate commonality.

---

[2] Whether Plaintiff's alternative theory of liability—concerning the discriminatory actions of her immediate supervisors—would pass muster under *Dukes* is a question the Court need not reach at this time.

## II. Rule 23(b)

Defendant next argues that Plaintiff's class allegations will inevitably fail because the proposed classes cannot satisfy any of the alternative criteria set forth in Rule 23(b).

If a plaintiff seeking class certification demonstrates by a preponderance of the evidence that the proposed class meets the requirements set out in Rule 23(a), then the court must determine whether the action satisfies one of the criteria of Rule 23(b). *See Dukes*, 564 U.S. at 345. Under Rule 23(b), a party may only maintain a class action by demonstrating that: (1) bringing the claims as separate actions would create a risk of inconsistent or adverse adjudications; (2) the party opposing the class has acted or refused to act on grounds that apply to the class in general, making injunctive or declaratory relief appropriate for the class as a whole; or (3) common questions of fact or law predominate over any individual questions and a class action is a superior method of efficiently and fairly adjudicating the matter. Fed. R. Civ. P. 23(b)(1)-(3).

Defendant asserts that Plaintiff can satisfy none of these criteria. First, Defendant argues that Rule 23(b)(1) does not apply "to discrimination [] cases like here where plaintiffs routinely prosecute separate actions." ECF No. 18-1 at 14 n.7. Second, Defendant contends that Rule 23(b)(2) does not apply where the proposed class "seeks monetary awards for backpay, compensatory, and punitive damages." ECF No. 18-1 at 20. Third, Defendant asserts that Rule 23(b)(3) cannot be satisfied because individual issues will necessarily predominate over common ones. Specifically, Defendant notes that it will be allowed to "present individualized defenses to each alleged instance of discrimination to show that the manager exercised discretion in a legitimate, non-discriminatory manner. Such defenses are particular to each manager and class member." ECF No. 18-1 at 22. Defendant also asserts that each class member will have

individualized damages issues. For the same reasons, Defendant argues that a class action will not be a superior method to adjudicate the controversy.

The Court declines to strike the class allegations based on these arguments. As an initial matter, Defendant's arguments concerning predominance and superiority are premised on its position that the Court must disregard Plaintiff's allegations about the executive brain trust. Because the Court will not do so at this early stage, Defendant's assertion that the proposed classes will necessarily challenge the "individualized discretionary decisions" of "hundreds of managers" falls flat. ECF No. 21 at 7. Regardless, the Court considers it premature to assess predominance and superiority. A court must engage in a careful, qualitative balancing of the relevant claims and issues to determine whether common issues predominate over individual ones. *See In re Petrobras Secs.*, 862 F.3d 250, 270-71 (2d Cir. 2017). Likewise, "assessing superiority is a fact-specific inquiry." *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 264 (2d Cir. 2016). Under these circumstances, it would be difficult, if not impossible, to fairly and fully engage in these inquiries solely on the basis of Plaintiff's amended complaint. Because Defendant presents no threshold arguments challenging the Rule 23(b)(3) factors—but rather, merely raises the sorts of objections that can and should be addressed at the class certification stage—the Court will not consider them at this time.[3] *See Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.*, No. 16-cv-5265, 2018 WL 1773142, at *2 (S.D.N.Y. Apr. 12, 2018) (stating that a motion to strike class allegations is "procedurally premature" except where the motion "addresses issues 'separate and apart from the issues that will be decided on a class certification motion'"). The motion to dismiss will not be granted on this ground.

---

[3] Because the Court is deferring consideration on the applicability of Rule 23(b)(3), it need not address whether Plaintiff can independently satisfy Rule 23(b)(1) or (b)(2).

### III. Sufficiency of Plaintiff's Claims

Defendant appears to argue that the amended complaint is insufficient because it fails to connect the allegedly "discriminatorily low performance rating[s]" to any tangible form of adverse action by Defendant. ECF No. 21 at 14. Defendant notes that Plaintiff does not plead any facts "to suggest that she applied for a particular promotion, was qualified for that promotion and was denied the promotion under circumstances giving rise to an inference of discrimination." *Id.*

The Court is not persuaded. One necessary element for a discrimination claim is that the employee experienced an adverse employment action.[4] *See Guerra v. Murphy*, No. 15-cv-1168, 2016 WL 7480405, at *4 (N.D.N.Y. Dec. 29, 2016). There is authority for the proposition that "a negative performance review, without more, does not represent an adverse employment action." *Chung v. City Univ. of New York*, 605 F. App'x 20, 22 (2d Cir. 2015) (summary order); *see also Atkins v. Rochester City Sch. Dist.*, No. 15-cv-6498, 2018 WL 1582238, at *5 (W.D.N.Y. Mar. 30, 2018). But negative employment evaluations can constitute adverse actions if "they trigger other negative consequences, such as a change in compensation, benefits, or job title." *Atkins*, 2018 WL 1582238, at *5.

Here, Plaintiff alleges that the executive brain trust exercises its discretion to assign final performance ratings in a manner that, whether intentionally or unintentionally, has the effect of depressing the final ratings of black and African-American employees. *See* ECF No. 16 ¶¶ 60, 74, 75, 229, 236. An employee's advancement to pay band "D"—which results in increased salary, bonuses, and networking opportunities—is conditioned on the employee receiving final ratings of "4" in two consecutive years. Accordingly, viewing the facts in the light most favorable to her,

---

[4] The same standard applies to Title VII, NYSHRL, and Section 1981 claims. *See Borzon v. Green*, No. 16-cv-7385, 2018 WL 3212419, at *8 n.18 (S.D.N.Y. June 29, 2018); *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 410-11 (S.D.N.Y. 2014).

Plaintiff articulates an adequate link between the discriminatory actions of the executive brain trust and tangible adverse impacts to black and African-American employees, including herself. *Accord Miller v. Dep't of Educ. of New York*, No. 17-cv-594, 2018 WL 1468703, at *3 (S.D.N.Y. Mar. 23, 2018) (negative performance rating which rendered plaintiff ineligible for certain promotional opportunities may constitute adverse employment action); *Shapiro v. N.Y.C. Dep't of Educ.*, 561 F. Supp. 2d 413, 423 (S.D.N.Y. 2008) (negative performance rating could constitute adverse action where, *inter alia*, it barred employees from applying for certain extracurricular positions and prevented them from moving up a salary step). The mere fact that Plaintiff does not identify a particular promotion that Defendant denied her is not fatal to her claim.

## CONCLUSION

For the reasons discussed above, Defendant Corning Incorporated's Motion to Dismiss (ECF No. 18) is DENIED. Defendant shall file an answer within 30 days of entry of this Order. *See* Fed. R. Civ. P. 12(a)(4).

IT IS SO ORDERED.

Dated: February 4, 2019
       Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court