UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

YULONDA WOODS-EARLY,

                              Plaintiff,

                                                      Case # 18-CV-6162-FPG

v.

                                                      DECISION AND ORDER

CORNING INCORPORATED,

                              Defendant.

## INTRODUCTION

*Pro se* Plaintiff Yulonda Woods-Early brings this employment-discrimination action against Defendant Corning Incorporated, her former employer.  Presently before the Court is Corning's motion for summary judgment.  ECF No. 73.  Despite receiving several extensions of time and notices of the consequences for failing to respond, Plaintiff has not filed a timely response.  *See* ECF Nos. 73, 75, 92, 100.  For the reasons that follow, Corning's motion is GRANTED.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-

moving party's favor.  *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

However, the non-moving party "may not rely on conclusory allegations or unsubstantiated

speculation."  *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation

omitted).

## BACKGROUND

The following facts are taken from the summary judgment record.  Corning operates in

the "specialty glass, ceramics, and life science industries."  ECF No. 73-1 ¶ 1.  In summer 2007,

Corning hired Plaintiff through its informal "Dual Career Program," whereby "Corning attempts

to hire spouses of key salaried employees who have relocated to the Corning area."  ECF No. 73-

26 ¶ 10.  In Plaintiff's case, Corning created a position for her—known as "Market Consultant

I"—within the Technology Strategy Group in its "Science & Technology" ("S&T") organization.

*Id.*; ECF No. 73-31 at 2 (copy of job description).  Corning did so despite the fact that S&T is a

"highly technical" department that "primarily recruits and hires individuals with technical

educational backgrounds, such as science and engineering," and Plaintiff, who possesses a Ph.D.

in economics, did not have the requisite education or prior work experience.  *Id.* ¶¶ 6-7, 10.

Corning created this position because Plaintiff's husband was employed in S&T and because

Plaintiff had expressed a desire "to work in a marketing role."  *Id.* ¶ 10; ECF No. 73-29 at 2.  At

the time, S&T did not otherwise have any positions matching Plaintiff's educational background

and work experience.  ECF No. 73-8 ¶ 5.

Initially, Plaintiff reported to Peter M. Grittner, the Research Director of Technology

Strategy, ECF No. 73-31 ¶ 26, but she was transferred to work under Pamela Strollo, Director of

Administration within S&T, in July 2008.  When a dispute arose between Strollo and Plaintiff

regarding Plaintiff's 2009 performance review, Charles Craig—Senior Vice President of S&T—

transferred Plaintiff to work under his supervision.  ECF No. 73-8 ¶ 11.  Plaintiff began working under Craig in September 2010.  *See id.* ¶ 12.  Plaintiff did not receive assignments directly from Craig's "work stream," as his department did not "perform market research functions (and did not otherwise have a need for Plaintiff's skillset)."  *Id.*  Instead, Plaintiff obtained assignments from other departments "where she could potentially add value and work product."[1]  *Id.*  Craig's hope "was that these [departments] would find value in Plaintiff's skill set and offer her a position within their department or organization in the future."  *Id.*

Craig and Plaintiff "initially got along well."  *Id.* ¶ 13.  In August 2011, Craig promoted Plaintiff to Market Consultant II, which included an increased salary and a $5,000 bonus.  *Id.* ¶ 13.  Plaintiff received a salary "merit" increase in March 2012.  ECF No. 73-7 at 61 [hereinafter "Pl. Dep."].  Nevertheless, Plaintiff's workload was "sporadic," consisting of short-term market research assignments for a variety of individuals within different areas of Corning, and "no business leaders for whom Plaintiff provided project work ever offered her a position in their organizations or departments."  ECF No. 73-8 ¶ 14.

Beginning in 2013, Plaintiff's assignments "significantly diminish[ed]," and from early 2013 to July 2014, Plaintiff had "nearly no work assignments at all."  *Id.* ¶ 15.  Plaintiff expressed dissatisfaction with her role, which was outside "Corning's traditional organizational structure for marketing positions."  *Id.*; *see also* Pl. Dep. at 59-60.  Thereafter, Plaintiff, Craig, and Gary Pease (an HR director in S&T), worked to find Plaintiff an "alternative job placement within Corning."  ECF No. 73-8 ¶ 15.  They began contacting other Corning departments to find "areas of the company where Plaintiff could be of use."  *Id.*  Craig went as far as to offer "to fund the salary for Plaintiff's position directly . . . for a period of time in order to offset any

---

[1] Plaintiff asserts that she was forced to obtain her own assignments, ECF No. 73-7 at 88, while Craig claims that he actively found assignments for her.  ECF No. 73-8 ¶ 14.  The dispute is not material.

[other departments'] budgetary constraints." *Id.* ¶ 16.  In 2013, Plaintiff applied to "several management-level roles . . . for which she was not hired." *Id.* ¶ 19; ECF No. 73-32 at 2.  Craig believed that Plaintiff was not "a competitive candidate for these roles" given her "relative inexperience (including lack of project management experience)," "unusual educational background," and "minimal work experience to date."  ECF No. 73-8 ¶ 19.  Plaintiff's relationship with Craig began to deteriorate, as Plaintiff perceived that Craig was not providing sufficient oversight, direction, or guidance to help her in her current role or in her career development. *See* Pl. Dep. at 116; ECF No. 73-22 at 5.  For example, Plaintiff alleges that Craig forced her to obtain her own assignments, failed to meet with her, failed to complete annual performance reviews, and excluded her from his staff meetings.  ECF No. 73-3 ¶¶ 10-11; Pl. Dep. at 116; ECF No. 38 ¶ 30.

In July 2014—after Dana Moss had assumed Pease's role in HR—Moss met with Plaintiff to "discuss her career development objectives and aspirations."  ECF No. 73-26 ¶ 18. Notwithstanding that, in Moss's view, "Plaintiff noticeably lacked prior managerial experience or project management experience often required for the types of management positions in which she was interested," Moss "committed to attempt to assist Plaintiff in obtaining her desired position." *Id.*  Plaintiff alleges that, at the July 2014 meeting, she informed Moss of her belief that Craig had refused to give her assignments or meet with her due to her race and/or sex. *See* Pl. Dep. at 118-19; ECF No. 73-26 ¶ 19.

Over the eight-month period between July 2014 and March 2015, Plaintiff provided weekly updates to Craig and Moss regarding her search to find a role matching her preferences, and met monthly with Craig and Moss to discuss their "collective job search activities."  ECF

No. 73-8 ¶ 32.  Fourteen positions were identified during that time, and, for various reasons, Plaintiff declined to apply to any of them.  *See* ECF No. 73-26 ¶ 43.

In March 2015, a dispute arose between Plaintiff and Craig regarding her 2014 performance review.  Craig rated Plaintiff a "3" out of "5" based on the feedback from the individuals who had supervised her two primary projects in 2014.[2]  *See* ECF No. 73-1 ¶¶ 92-95.  Plaintiff believed that she should be rated a "4."  Pl. Dep. at 126.  By this point, Plaintiff's relationship with Craig had deteriorated to the point that Plaintiff felt compelled to record the March 6, 2015 in-person performance review with Craig because a third party was not available to attend the meeting.  *See* ECF No. 73-22 at 2; Pl. Dep. at 123. After that meeting, Craig informed Moss that Plaintiff "would be better served by having a new supervisor."  ECF No. 73-8 ¶ 48; *see also* ECF No. 73-20.  Although performance reviews are supposed to close "at the end of March each year," ECF No. 73-63 ¶ 18, Plaintiff's review was not completed by March 2015.

In April 2015, Plaintiff wrote an email to Craig and Moss raising a variety of complaints and cancelling all future monthly meetings.  ECF No. 73-55.  Plaintiff expressed her dissatisfaction with her current role, her lack of career advancement and professional development, and the perceived lack of support offered by Craig and Moss.  *See generally* ECF No. 73-22.  Plaintiff also alluded to race and/or gender discrimination as the reason for at least some of her treatment.  *See id.* at 5 ("I [do] not believe if I was of another race or gender that this would be happening me.").  Plaintiff refused to work with Craig and Moss thereafter to assist with her career advancement.  Pl. Dep. at 118.  After receiving the email, Moss met with Chistine Pambianchi—Senior Vice President of Human Resources—to "inform her of Plaintiff's

---

[2] The possible performance-review ratings are "1 through 5, which correlate[] to the following ratings: (1) failed to meet expectations; (2) partially met expectations; (3) fully met expectations; (4) exceeded expectations; and (5) far exceeded expectations."  ECF No. 73-26 ¶ 44.

refusal to work with [Moss] going forward and seek[ing] her guidance on how best to address the situation." ECF No. 73-26 ¶ 55. Pambianchi instructed Moss to continue to work with Plaintiff to "facilitate her desired job placement within Corning." ECF No. 73-63 ¶ 6. Separately, Plaintiff scheduled a meeting with Pambianchi to discuss Plaintiff's concerns. *See id.* ¶ 11.

On May 19, 2015, Plaintiff had a meeting with Pambianchi and Kevin Corliss (Vice President of Global Employee Relations and Employment Law). *Id.* Plaintiff surreptitiously recorded the meeting. *Id.* ¶ 12. At that meeting, Pambianchi agreed to assist Plaintiff "in locating a potential position with Corning," and she also agreed to help ensure that Plaintiff's 2014 performance review was finalized. *Id.* ¶¶ 16-17; *see also* ECF No. 73-65. Craig finalized his portions of Plaintiff's performance review in June 2015, and, after Plaintiff declined to add any additional comments or re-submit her self-evaluation, the performance review was treated as final as of July 22, 2015. ECF No. 73-66 at 2-3; ECF No. 73-8 ¶¶ 60-64.

In August 2015, Pambianchi decided to issue an ultimatum to Plaintiff: Plaintiff would be given a ninety-day period "solely dedicated to searching for a new position either within Corning or outside of Corning." ECF No. 73-63 ¶ 30. If Plaintiff failed to obtain a new position within that period, Plaintiff would be terminated and given a "severance offer." *Id.* Pambianchi hired a third-party "talent solutions provider" to help Plaintiff with "career placement services." *Id.* ¶ 32. Pambianchi made this decision because Plaintiff had been in her "specially created" position for eight years, was "plainly unhappy and dissatisfied," and received "inconsistent and sporadic work assignments." *Id.* ¶ 31. Pambianchi did not believe that Plaintiff's current role "was [] providing sufficient value to continue warranting a fulltime position with the company." *Id.* Pambianchi gave Plaintiff ninety days to secure a new position "because, up to that point, Plaintiff had [] refused to apply to any permanent position within Corning's traditional business

organizations within the past two (2) years." *Id.* Plaintiff was provided with a "third-party professional talent solutions provider" to help her with career placement services, and she was not required to engage in any projects or work assignments during that period. *Id.* ¶¶ 32, 33. Ultimately, Plaintiff did not apply to any positions within Corning or utilize the third-party provider. *Id.* ¶ 35. Accordingly, Corning placed Plaintiff on paid leave after the ninety-day period and thereafter terminated her employment as of December 31, 2015. *Id.* ¶ 37.

In February 2018, Plaintiff filed this action. ECF No. 1. In her second amended complaint, Plaintiff brings ten claims for relief: (1) unequal pay based on gender in violation of the federal Equal Pay Act ("EPA"); (2) unequal pay based on gender in violation of New York Labor Law ("NYLL"); (3) race and/or color discrimination under Title VII of the Civil Rights Act of 1964; (4) race and/or color discrimination under 42 U.S.C. § 1981; (5) race and/or color discrimination under the New York State Human Rights Law ("NYSHRL"); (6) gender discrimination under Title VII; (7) gender discrimination under the NYSHRL; (8) retaliation under Title VII; (9) retaliation under Section 1981; and (10) retaliation under the NYSHRL. *See generally* ECF No. 38.

## DISCUSSION

Corning moves for summary judgment on all claims. For the reasons that follow, the Court agrees that Corning is entitled to judgment as a matter of law with respect to all of Plaintiff's claims.

### I.  Unequal Pay Claims under the EPA and NYLL

#### a.  Legal Standard

Plaintiff's EPA and NYLL claims—that she received unequal pay based on her gender—are analyzed under the same standards. *See Tulino v. City of New York*, No. 15-CV-7106, 2016

WL 2967847, at *6 (S.D.N.Y. May 19, 2016).  "[T]o prove a violation of the EPA [or NYLL], a plaintiff must demonstrate that (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions."  *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 690-91 (2d Cir. 2017) (summary order).  "Critical to [these claims are] the equal work inquiry, which requires evidence that the jobs compared are substantially equal."  *Id.* at 691 (internal quotation marks omitted).  "[A] plaintiff must establish that the jobs compared entail *common duties or content, and do not simply overlap in titles or classifications*.  A successful [] claim depends on the comparison of actual job content; broad generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of sex discrimination, cannot suffice."  *Id.* (internal citation, quotation marks, and brackets omitted; emphasis added).  Relevant factors include whether "[plaintiff] and her comparators had the same title or rank; worked for the same division; shared supervisors; had analogous managerial responsibilities; performed the same tasks; had the same skills or experience; and worked on projects of a similar size or budget."  *Moazzaz v. MetLife, Inc.*, No. 19-CV-10531, 2021 WL 827648, at *6 (S.D.N.Y. Mar. 4, 2021).

**b.  Analysis**

Plaintiff has failed to demonstrate that the opposite-sex employees that she has identified "perform[ed] equal work on jobs requiring equal skill, effort, and responsibility."  *Chiaramonte*, 677 F. App'x at 690.  In her deposition, Plaintiff identifies two male comparators: Kirk Carpenter and Mark Soulliere.  Plaintiff alleges that Carpenter was a "Strategy Project Manager" and Soulliere was a "Market Development Manager."  Pl. Dep. at 66-68; *see also* ECF No. 38 ¶¶

30-46.  Corning submits evidence that demonstrates that Soulliere's and Carpenter's roles were not comparable, however.

Plaintiff's job description indicates that, as a Market Consultant I, Plaintiff was tasked with analyzing markets and new business opportunities.  ECF No. 73-31 at 2.  She would work with "existing business teams and internal and external resources to develop and recommend strategies for market and product development, product positioning, pricing, distribution and promotion."  *Id.*  Plaintiff was to conduct financial analysis and "[e]nsure[] alignment of customer requirements and product attributes."  *Id.*  Plaintiff was to work under general supervision and contribute "to the completion of milestones associated with specific projects." *Id.*  She would "[i]nfrequently" engage in "inter organizational and outside customer contacts." *Id.*

In practice, Plaintiff worked inconsistently on "ad hoc projects" from several departments, while "Mr. Soulliere and Mr. Carpenter derived and sourced their work directly from the dedicated functions of their respective departments and work groups, and they were consistently engaged at all times in that work."  ECF No. 73-26 ¶ 91.  In her declaration, Moss describes in detail the differences between their positions and Plaintiff's.  *See id.* ¶¶ 98, 99, 104, 105.  It is unnecessary to catalog all of these differences here; it suffices to say that the comparators' work, supervision, responsibilities, skills, and experience establish that they do not perform "equal work" to Plaintiff.  *Chiaramonte*, 677 F. App'x at 690.

The contrary evidence that Plaintiff identifies is insufficient to create a genuine issue of material fact.  For both comparators, Plaintiff relies primarily on conversations she had concerning their job duties.[3]  In the case of Carpenter, Plaintiff's knowledge comes from

---

[3] At her deposition, Plaintiff also referenced the fact that she had compared job postings of the two positions.  *See* Pl. Dep. at 84.  Because Plaintiff does not actually disclose what those postings revealed about the similarities, this

conversations she had with Carpenter's manager, who occasionally transferred work assignments from Plaintiff to Carpenter. *See* Pl. Dep. at 81 ("There were certain things that I provided for [the manager] in the past that he then said, "oh, [Carpenter], by the way, Yulonda was doing this. Can you do this? Can you take this over from her?"). From the fact that Carpenter occasionally took on her assignments, Plaintiff appears to infer that their jobs duties were substantially similar. *See id.* at 85 (stating that Carpenter's role was "lateral" to hers because she could hear "[what the manager was] asking" and because "the things that were asked of me were some of the things that were placed in that Strategy Manager position").

In the case of Soulliere, Plaintiff acknowledged that she was unaware of "each and every job duty" that Soulliere had, *id.* at 73-74, but she did "see things that [he] actually produced" and believed them to be comparable to her own work. *Id.* at 75; *see also id.* at 74 (stating that she did not see a difference "on the surface"). She also had a friendly relationship with Soulliere and would discuss "his work," such that she "understood some things about their work product." Pl. Dep. at 76; *see also id.* at 78 ("[W]e interacted. . . . 'How's work? What do you have going on?' . . . 'What do you need? What are they stuck on?'"). Plaintiff did not work on any projects with Soulliere directly and did not know the particular goals or objectives provided to Soulliere. *Id.* at 76-78. As with Carpenter, Plaintiff infers from these observations and interactions that her job was substantially similar to Soulliere's. *See id.* at 85 (concluding that the Market Development Manager position was lateral to hers "[i]n terms of the responsibilities that I could see").

Without more factual support, however, Plaintiff's inferences are unreasonable. Plaintiff admits that her belief is derived from casual conversations and observations and is not derived from any sort of global knowledge of Soulliere's or Carpenter's work and backgrounds.

---

conclusory assertion does not constitute the sort of "specific facts" that are necessary to show that Plaintiff "performed substantially equal work to" her comparators. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

Plaintiff's firsthand knowledge may indeed prove that Soulliere and Carpenter sometimes or oftentimes performed comparable tasks to her, but "positions are not considered substantially similar merely because one performs identical work part of the time." *Carini v. Monongahela Power Co.*, 930 F.2d 23 (4th Cir. 1991) (table op.); *see also Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1220 (9th Cir. 2021) ("[I]t is the overall job, not its individual segments, that must form the basis of comparison."). Plaintiff identified no evidence in her deposition that would suggest that the things she heard or observed about her comparators' work encompassed the *entirety* of their duties. To the contrary, as Moss described in her declaration—and which Plaintiff cannot now dispute, *see* Loc. R. Civ. P. 56(a)(2)—Carpenter's and Soulliere's responsibilities differed from Plaintiff's in many significant respects, as did their education and work experience. *See* ECF No. 73-26 ¶¶ 90-106.

In short, it is not enough to point out "that some work duties overlap," as that assertion "ignores the myriad factors, such as education, training, job requirements, job responsibilities, hours worked, and similar working conditions, all of which need to be considered." *Miller v. City of New York*, No. 15-CV-7563, 2018 WL 2059841, at *7 (S.D.N.Y. May 1, 2018). Plaintiff has not marshalled sufficient evidence to demonstrate that her comparators "perform[ed] equal work on jobs requiring equal skill, effort, and responsibility." *Chiaramonte*, 677 F. App'x at 690. And because Plaintiff has not presented sufficient evidence to meet her *prima facie* burden, summary judgment is warranted on Plaintiff's EPA and NYLL claims relating to unequal pay.

## II.    Title VII, NYSHRL, and Section 1981 Claims for Race Discrimination

### a.    Legal Standard

Plaintiff's race discrimination claims under Title VII, NYSHRL, and Section 1983 are "analyzed pursuant to the familiar three-part framework set forth in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973)." *Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022). "Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a prima facie case of employment discrimination by showing that: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Id.* (internal quotation marks omitted). "If the plaintiff does so, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action." *Nieblas-Love v. N.Y.C. Housing Auth.*, 165 F. Supp. 3d 51, 66 (S.D.N.Y. 2016) (internal quotation marks omitted).

"Once the defendant puts forward such a legitimate, non-discriminatory reason the plaintiff may no longer rely on the presumption raised by the prima facie case, but rather must put forward evidence that would allow a reasonable jury to conclude that the employer's determination was in fact the result of racial discrimination." *Id.* (internal quotation marks omitted). "That is, the plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Id.* (internal quotation marks and brackets omitted).

### b. Timeliness

Plaintiff alleges a variety of racially motivated adverse actions over the course of her career at Corning. *See, e.g.*, ECF No. 38 ¶ 30; ECF No. 73-3. Because many of these discrete adverse actions fall outside of the relevant statutes of limitations, they must be dismissed as time-barred.

Title VII requires a plaintiff to file a notice with the EEOC "within 300 days of an alleged adverse action." *Wade v. N.Y.C. Dep't of Educ.*, 667 F. App'x 311, 312 (2d Cir. 2016) (summary order). Plaintiff filed her EEOC charge on February 22, 2016, *see* ECF No. 73-3 at 3, so no discriminatory act that occurred before April 28, 2015 is actionable under Title VII. *See id.* ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."). The NYSHRL claims are "subject to a three-year statute[] of limitations," *Johnson v. Wendy's Corp.*, No. 19-CV-8157, 2021 WL 243055, at *4 (S.D.N.Y. Jan. 25, 2021), and "[t]he statute of limitations for § 1981 claims alleging discrimination in the workplace is four years." *Bell v. SL Green Realty Corp.*, No. 19-CV-8153, 2022 WL 2819054, at *4 (S.D.N.Y. July 19, 2022). Therefore, because Plaintiff filed her complaint on February 23, 2018, ECF No. 1, no discriminatory act occurring prior to February 23, 2015 is actionable under the NYSHRL, and no act occurring prior to February 23, 2014 is actionable under Section 1981.[4]

These time bars significantly limit the universe of allegedly discriminatory acts at issue. Plaintiff may not challenge her hiring (August 2007), any acts by Grittner (under whom she worked from August 2007 to July 2008), any acts by Strollo (under whom she worked from July 2008 to September 2010), any acts by Craig preceding February 2014, and any promotional opportunities that arose in 2013 or earlier. Indeed, Plaintiff cannot bring *any* claim under a failure-to-promote theory, as it is undisputed that she did not apply for any position in 2014 or 2015—that is, at any point within the limitation periods. *See* Pl. Dep. at 97; *see also Fox v. Cty. of Yates*, 657 F. App'x 60, 63 (2d Cir. 2016) (summary order) ("To succeed on a discriminatory failure to promote claim, a plaintiff must ordinarily actually apply for the promotion or position.").

---

[4] Plaintiff did not file a response and therefore makes no argument regarding equitable tolling.

Accordingly, the Court limits its analysis to those allegedly discriminatory acts occurring in or after February 2014, which is the earliest relevant limitation period.  Reading the second amended complaint liberally, Plaintiff alleges that, during this period, she suffered from unlawful discrimination in that (a) Craig subjected her to a variety of unfair working conditions, including by "neglecting to meet with her for months at a time," "purposefully excluding her from staff meetings," relying on inconsistent standards for performance reviews, failing to assist her with promotional opportunities and professional development, and paying her less; and (b) Pambianchi issued a ninety-day ultimatum and subsequently terminated her employment.  ECF No. 38 ¶ 30.

### c.  Analysis

#### i.  Working Conditions

Plaintiff alleges that, during her time under Craig's supervision, he failed to meet with her for months at a time, excluded her from staff meetings, failed to secure work assignments for her, did not provide consistent rationales for her performance ratings,[5] and subjected her to unequal pay.  ECF No. 73-3 ¶¶ 8-12; ECF No. 38 ¶ 30; Pl. Dep. at 127-28.  Plaintiff alleges that these actions harmed her and negatively impacted her ability to secure a traditional role within Corning.  *See, e.g.*, ECF No. 38 ¶¶ 110-11.  Because the Court concludes that these purportedly adverse actions did not occur "under circumstances giving rise to an inference of

---

[5] Plaintiff's claim relating to her 2014 performance rating also fails because Plaintiff's rating does not constitute an adverse action.  "An 'unsatisfactory' performance review is not an adverse employment action where it does not affect a person's compensation, benefits, or job title."  *Kunik v. N.Y.C. Dep't of Educ.*, 842 F. App'x 668, 672 (2d Cir. 2021) (summary order); *see also Fairbrother v. Morrison*, 412 F.3d 39, 56-57 (2d Cir. 2005), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  Because Plaintiff never applied for any promotion after receiving that rating, and does not otherwise substantiate how the rating affected the terms or conditions of her employment, her rating is not an adverse action.  *See Palmer-Williams v. Yale New Haven Hosp.*, No. 08-CV-1526, 2011 WL 1226022, at *8 (D. Conn. Mar. 27, 2011) ("Plaintiff never actually applied for any other jobs and her belief that hypothetical job reviewers may be put off by part of her performance evaluation is mere conjecture or surmise, which is insufficient to defeat summary judgment." (internal citation and quotation marks omitted)).  Furthermore, the Court notes that, at her deposition, Plaintiff was unable to identify any comparator to show that she suffered from discrimination in connection with her performance reviews.  *See* Pl. Dep. at 91-93.

discrimination," no discrimination claim based on such actions survives summary judgment. *Nieblas-Love*, 165 F. Supp. 3d at 66.

Some context may be helpful. As Plaintiff herself alleges, Plaintiff's dissatisfaction with her working conditions stems in part the fact that it was a non-traditional role. And although she alleges otherwise, *see* ECF No. 38 ¶ 30, the record establishes that Plaintiff was hired for this non-traditional role not due to racial discrimination, but to accommodate Plaintiff and her career interests, with the goal of moving her into a more traditional role. *See* ECF No. 73-8 ¶¶ 3-6; Pl. Dep. at 31, 35, 40-41.

During her employment with Corning, Plaintiff received many benefits through this arrangement. She was hired to work in a bespoke position tailored to her particular career aspirations, rather than her existing qualifications and experience. *See* ECF No. 73-8 ¶¶ 5-6. She received a $70,000 salary and a $20,000 signing bonus. ECF No. 73-26 ¶ 11. Plaintiff also received a promotion to a different pay band and annual pay increases, such that, at the time of her termination, her annual salary was $98,562. *See* ECF No. 73-30 at 4-5. Although the parties dispute the full extent of the training and professional development that Corning provided to Plaintiff, it is undisputed that Corning gave Plaintiff the flexibility to work with different groups and departments, and provided training through Stanford University (at a cost of over $38,000 to Corning), in order to better "prepar[e] Plaintiff for her desired positions." ECF No. 73-8 ¶ 20; *see also id.* ¶¶ 7-9, 23.

Nevertheless, as Plaintiff explains in her deposition, there were downsides to occupying a bespoke position such as hers. Because she was outside of the traditional organizational structure, other Corning employees did not understand her position or give it the same "respect [] like they would any other role." Pl. Dep. at 40, 60. Furthermore, Plaintiff's position did not

entail the ordinary dynamics of supervision and teamwork that existed in Corning's traditional departments and working groups. While Plaintiff technically worked under Strollo's and Craig's supervision, Plaintiff did not perform assignments within either supervisor's "work stream" because neither Strollo nor Craig performed market research functions. ECF No. 73-8 ¶¶ 9, 12. One could reasonably foresee that such a dynamic could lead to Plaintiff's relative isolation compared to other employees under Strollo's and Craig's supervision. Unlike Plaintiff—who was working on assignments for other groups and departments—Strollo, Craig, and the employees under their supervision were in regular contact given their shared work streams. *See, e.g.*, ECF No. 73-3 ¶ 11. And Strollo and Craig could only evaluate Plaintiff's performance based on what they learned from others who worked with Plaintiff, which led to disputes over the accuracy of their evaluations. *See* ECF No. 73-8 ¶¶ 9-10, 37; Pl. Dep. at 51-52, 128.

But Plaintiff alleges that her non-traditional role is not solely to blame for her unsatisfactory work situation. She claims that Craig acted in ways that impeded her ability to thrive in her role and develop professionally, and she attributes those dynamics to race and/or color discrimination. Although the burden of showing an inference of discrimination is "minimal" at the *prima facie* stage, *Littlejohn v. City of New York*, 795 F.3d 297, 308 (2d Cir. 2015), the record does not contain sufficient evidence to support Plaintiff's allegation. "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or [a suspicious] sequence of events leading to the [adverse action]." *Id.* at 312.

First, Plaintiff attempts to make this showing by pointing to disparate treatment compared to fellow white employees. "To support a minimal inference of discrimination, a plaintiff may allege disparate treatment by showing the more favorable treatment of employees not in the protected group," so long as they are "similarly situated in all material respects." *Carris v. First Student, Inc.*, 682 F. App'x 30, 32 (2d Cir. 2017) (summary order).

Plaintiff notes that Glenn Bleiler—a white, male employee whom she met in 2015— told her that he routinely participated in staff meetings with Craig, his supervisor. *See* ECF No. 73-3 ¶ 11. Plaintiff infers from this that she was intentionally isolated in her position due to her race. *See id.* Such an inference cannot reasonably be made on the present record. There is no evidence before the Court that Bleiler's position was similar to Plaintiff's non-traditional role, such that a comparison can be made between his treatment and Plaintiff's. If, as Plaintiff's allegation seems to suggest, Bleiler worked directly within Craig's "work stream," ECF No. 73-8 ¶ 12; *see also* ECF No. 73-3 ¶ 11, one would reasonably expect that Craig and Bleiler would meet routinely given their shared projects. The same cannot be said of Plaintiff, as Craig's group "did not perform market research functions" or "otherwise have a need for Plaintiff's skillset." ECF No. 73-8 ¶ 12. At her deposition, Plaintiff even admitted that she was "not sure" what contributions she could have provided during Craig's staff meetings. Pl. Dep. at 71. Accordingly, Plaintiff has failed to meet her burden of "proving that the comparator is appropriate." *Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 24 (2d Cir. 2017) (summary order).

The other comparators whom Plaintiff identifies suffer from the same problem. In her deposition, Plaintiff identifies two white comparators who had regular meetings with Strollo, their supervisor, *see* Pl. Dep. at 66, but neither in Plaintiff's deposition nor elsewhere in the

present record is there sufficient evidence to conclude that these employees are, in fact, adequate comparators.  If anything, the opposite inference must be drawn, given Plaintiff's non-traditional role and her unusual supervisory arrangement with Strollo.  Plaintiff also references Carpenter and Soulliere as comparators with respect to Craig "forcing [her] to generate [her] own work" and with respect to her unequal pay.  *Id.*  For the reasons stated above, however, Carpenter and Soulliere are not adequate comparators.

Second, while Plaintiff admits that Craig never made any explicitly derogatory comments about race or gender, Pl. Dep. at 146, she cites one conversation with Craig as evidence of race discrimination.  At an August 2014 meeting with Plaintiff, Craig, Pease, and Moss, Craig began to discuss two black employees:

> [Craig] began to discuss [F.S.] and [K.M.].  He shared that OFC did not want to hire [K.M.] and that her Husband had already moved to another state.

> [Craig] also expressed that [F.S.] had scheduled a research meeting where he asked him, "Shouldn't the business be involved?"  He continued on to state that [F.S.] said that they knew and then had to cancel the meeting because the business was not in support of it.  He spoke about him not having the right relationship with the business.

ECF No. 73-22 at 5.  Plaintiff was shocked that Craig would speak about other personnel when it was not "relevant" and believes that he did so only to "belittle [Plaintiff's] Black colleagues and to intimidate [her]."  ECF No. 73-3 ¶ 24.

This sort of "remote and oblique" remark, *Henry v. Wyeth Pharma., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010), which does not "on its face indicate a racially discriminatory attitude" and is unconnected to any particular discriminatory action, *Inguanzo v. Housing & Servs., Inc.*, 621 F. App'x 91, 92 (2d Cir. 2015) (summary order), is insufficiently probative of Craig's allegedly discriminatory intent to satisfy Plaintiff's burden.  *See Henry*, 616 F.3d at 149 (discussing factors in determining whether a "stray remark" is probative of discriminatory intent); *see also Abdu-*

*Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ("[T]he stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination.").  Even more overtly discriminatory remarks have, depending on the circumstances, been held insufficient to permit an inference of discrimination. *See, e.g.*, *Pierre v. City of New York*, 844 F. App'x 411, 413 (2d Cir. 2021) (summary order) (supervisor's comment to "get rid of the 'Black guy' in the division 'because he was making too much money'" insufficient to raise an issue of fact as to discrimination); *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 306-07 (2d Cir. 2021) (supervisor's comments that plaintiff "was too old" and must be replaced "with [a] younger counterpart");  *Langlois v. Hartford Bd. of Educ.*, 831 F. App'x 548, 550-51 (2d Cir. 2020) (summary order) (principal's comment that "[w]hite teachers could not, are not competent to teach our students").

Once these alleged indicia of discrimination are put aside, all that is left are Plaintiff's complaints about her non-traditional role and pay, her disagreements with her performance ratings, and the other mistreatment she alleges that she suffered under Craig's supervision. "Although mistreatment by [a defendant] is not irrelevant in assessing the strength of [a] plaintiff['s] circumstantial evidence of race-based animus, it is certainly not sufficient to establish it." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 102 (2d Cir. 2001).  In other words, Plaintiff cannot simply "cite to [her] mistreatment and ask the [C]ourt to conclude that it must have been related to [her] race." *Id.* at 104.  Because the record does not contain sufficient evidence from which an inference of discrimination can be drawn, Plaintiff's race discrimination claims based on Plaintiff's working conditions under Craig fail at the *prima facie* stage.

### ii. Termination

To the extent Plaintiff contends that her termination was an instance of race discrimination, that claim likewise fails because she has failed to show that Pambianchi took this action "under circumstances giving rise to an inference of discrimination." *Nieblas-Love*, 165 F. Supp. 3d at 66.  Conceding that Pambianchi never said "anything derogatory or negative" about Plaintiff's race, Pl. Dep. at 147, Plaintiff instead points to two circumstantial indicia to demonstrate bias.

First, Plaintiff alleges that Pambianchi was "curt" in her interactions with Plaintiff.  *Id.* at 148.  Standing alone, this does not permit an inference of racial discrimination.  *See, e.g.*, *Wellington v. Spencer-Edwards*, No. 16-CV-6238, 2019 WL 2764078, at *2 (S.D.N.Y. July 1, 2019) (noting that "[d]irty looks' do not give rise to an inference of discrimination"); *Cruz v. Bernstein Litowitz Berger & Grossman LLP*, No. 20-CV-8596, 2023 WL 2691456, at *13 (S.D.N.Y. Mar. 29, 2023) (collecting cases).

Second, Plaintiff draws an inference of racial discrimination from the alleged removal of certain emails from an email chain concerning her 2014 performance rating.  *See* Pl. Dep. at 147-48, 150, 157.  The removal of these emails—which pertained to "[d]ates of meeting and when [] Craig was [traveling]," *id.* at 137—caused the situation surrounding her 2014 review to appear more favorable to Craig.  *See id.* at 137, 157.  Plaintiff appears to believe that the removal of these emails was a ruse used to place "blame" on her for the "missed performance review deadline."  ECF No. 73-3 ¶ 28.

Again, the inference that Plaintiff wishes to draw from these facts is unreasonable, at least based on the present record.  There are no surrounding facts to suggest that any of the individuals involved in the email chain held any racial bias against Plaintiff.  More importantly,

Plaintiff's theory is not plausible: there is no evidence that Plaintiff was ever "blamed" or otherwise disciplined for "missing" the performance review deadline.  Rather, when Plaintiff informed Pambianchi in May 2015 that Craig has not completed her 2014 review, Pambianchi directed Craig to complete the review and gave Plaintiff an opportunity to provide further employee feedback.  *See* ECF No. 73-66; ECF No. 73-65 at 31-34.  Although Plaintiff declined that opportunity, she received a final 2014 performance rating as of July 2015.  *See* ECF No. 73-66 at 2-4.  Under these circumstances, a nefarious, let alone discriminatory, motive cannot be inferred from the mere removal of certain emails from an email chain.

Without competent evidence of race and/or color discrimination, Plaintiff may not proceed with her claim of race discrimination premised on her termination.

### d.  Summary

For the reasons stated above, all of Plaintiff's race-discrimination claims must be dismissed, as they are either untimely or unsupported by sufficient evidence to survive summary judgment.

## III.   Gender Discrimination

Plaintiff's claims of gender discrimination under Title VII and the NYSHRL fail for the same reasons as her claims of race discrimination: the Court cannot conclude from the present record that any of the adverse actions that Plaintiff identifies "occurred under circumstances giving rise to an inference of gender discrimination."  *Cherry v. N.Y.C. Housing Auth.*, 564 F. Supp. 3d 140, 165 (E.D.N.Y. 2021).  Therefore, these claims must be dismissed.[6]

---

[6] Given this conclusion, the Court need not address Corning's arguments that these claims are untimely.  *See* ECF No. 73-67 at 23-25.

## IV.   Retaliation

### a.  Legal Standard

Plaintiff brings retaliation claims under Title VII, the NYSHRL, and Section 1981, which are analyzed under the same standard.  *See Alvarado v. United Hospice, Inc.*, No. 20-CV-10790, 2022 WL 4485379, at *16 (S.D.N.Y. Sept. 27, 2022).  "To make out a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in a protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Id.* (internal quotation marks omitted).  "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, non-discriminatory reason existed for its action.  If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation."  *Id.* (internal quotation marks, citation, and brackets omitted).

### b.  Analysis

Plaintiff alleges that she engaged in activity protected from retaliation—namely, by recording the March 6, 2015 meeting with Craig and by emailing her complaints to Craig and Moss on April 17, 2015, *see* Pl. Dep. at 154—and that, in response, Corning retaliated against her (a) by delaying the finalization of her 2014 performance review and (b) by giving her the 90-day ultimatum, which led to the termination of her employment.  ECF No. 38 ¶¶ 12, 30, 341.

The Court first addresses the delay related to Plaintiff's 2014 performance review.  Plaintiff's 2014 performance review was not finalized until July 22, 2015—an approximately four-month delay from the normal deadline for the completion of such reviews.  *See* ECF No.

73-63 ¶ 18 (noting that the performance-review "window normally closes at the end of March each year").   Plaintiff contends that this retaliatory action was materially adverse because, without a finalized performance review, it would be more difficult for her to transfer to a new role.   *See* ECF No. 73-3 ¶ 28; Pl. Dep. at 148; *see also* ECF No. 38 ¶ 277.   Plaintiff cannot establish a *prima facie* case of retaliation because, under the circumstances presented, such delay is not materially adverse.

For purposes of a retaliation claim, an action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Tepperwien v. Entergy Nuclear Ops., Inc.*, 663 F.3d 556, 568 (2d Cir. 2011).   By contrast, "[a]ctions that are 'trivial harms'—i.e., those petty slights or minor annoyances that often take place at work and that all employees experience—are not materially adverse."   *Id.* (internal quotation marks omitted).   The delay at issue falls into the latter category.

To be sure, "excluding an employee" from opportunities that "contribute[] significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *White*, 548 U.S. at 69; *see also Garel v. City of New York*, No. 04-CV-3506, 2006 WL 3024725, at *3 (E.D.N.Y. Oct. 23, 2006) (stating that courts have found employer actions materially adverse "where an employee's chances for promotion were affected by the adverse act").   But there is no evidence to substantiate Plaintiff's claim that the four-month delay interfered with her search for a new role.   Plaintiff never applied for any positions within Corning in 2014 or 2015, *see* Pl. Dep. at 97-98, and she identifies no opportunity that she missed due to the delay.   *Compare Ikedilo v. Montefiore Med. Ctr.*, No. 19-CV-9967, 2021 WL 3887717, at *7 (S.D.N.Y. Aug. 31, 2021) (concluding that "short delay in submitting an evaluation to another employer" did not "qualify as an adverse action," where the

delay "had no apparent effect on Plaintiff's employment prospects"), *with McDowell v. McDonough*, No. 21-CV-338, 2022 WL 18539464, at *4 (W.D.N.Y. Dec. 21, 2022) (delay in providing employee with performance appraisal constituted adverse action, where the delay prevented him from applying for other opportunities because, absent the appraisal, his application was "deemed incomplete"). *See also F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (noting that a non-moving party cannot defeat summary judgment based on "conclusory allegations or unsubstantiated speculation").

Moreover, Plaintiff facilitated much of the delay by her own actions: she challenged Craig's initial evaluation, submitting two lengthy emails to support her position, ECF No. 73-54; she then sought the assistance of, and a meeting with, Pambianchi, ECF No. 73-64; and, at least for some period, Plaintiff's review remained open because she refused to mark the review process complete, ECF No. 73-66. This is not to say that any of Plaintiff's actions were unjustified or blameworthy, only that Corning did not unilaterally delay Plaintiff's review in a manner that could reasonably be perceived as an "alien and ominous threat" to her career development. *Bosse v. Dep't of Economic & Comm. Dev.*, No. 20-CV-760, 2021 WL 6337750, at *10 (D. Conn. Aug. 3, 2021). It was akin to a "bureaucratic delay," resulting from the back-and-forth discourse between Plaintiff and other Corning employees about her performance review, which cannot be considered materially adverse—particularly given the absence of any practical consequence from the delay. *Zoulas v. N.Y.C. Dep't of Educ.*, No. 18-CV-2718, 2021 WL 3932055, at *14 (S.D.N.Y. Sept. 1, 2021) (delays in obtaining approval for a trip would not "deter a reasonable person from filing a complaint of discrimination"); *see also Nunez v. Lima*, 762 F. App'x 65, 70 (2d Cir. 2019) (summary order) (delays in processing employee's report was not a materially adverse action where the employee was "not disciplined for the delay").

Indeed, "it is relevant that" Plaintiff herself was not "deterred from complaining" during the pendency of the review process. *Tepperwien*, 663 F.3d at 572.

Accordingly, Plaintiff's retaliation claims fail to the extent they are premised on the delay occurring during her 2014 performance review.

The only remaining adverse action that Plaintiff identifies is the ninety-day ultimatum followed by the termination of her employment. Plaintiff posits that Pambianchi issued the ultimatum as retaliation for Plaintiff's recording of the March 6, 2015 meeting with Craig and Plaintiff's April 17, 2015 email to Craig and Moss. *See* Pl. Dep. at 154. Assuming *arguendo* that Plaintiff's recording and email constitute protected activity, there is insufficient evidence in the record to conclude that a "a causal connection exists between [Plaintiff's] protected activity" and these adverse actions. *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011) (summary order).

There is no direct evidence of retaliatory intent in the present record; indeed, at her deposition, Plaintiff conceded that Pambianchi never said anything to her that suggested a "retaliatory intent." Pl. Dep. at 153. The only indirect evidence on which Plaintiff could rely is the temporal proximity between her protected activities (March 6 and April 17, 2015) and the date on which she was given the "ninety-day" ultimatum (August 6, 2015). The Court concludes that no inference of retaliation can be reasonably drawn from this temporal proximity.

While "temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action," *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010), the "temporal proximity must be very close." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014). The Second Circuit has "not drawn a bright line to

define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," and instead directs courts to exercise their "judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Sirois v. Long Island Railroad Co.*, 797 F. App'x 56, 60 (2d Cir. 2020) (summary order).

Here, Pambianchi issued the ultimatum more than three months after the last of Plaintiff's protected activities. *See* ECF No. 73-63 ¶ 30; ECF No. 73-26 ¶ 75. Standing alone, a temporal gap of that length may be insufficient to draw an inference of retaliation. *See, e.g.*, *Payne v. Cornell Univ.*, No. 12-CV-109, 2022 WL 453441, at *4 (2d Cir. Feb. 15, 2022) (summary order) (noting that "district courts in this circuit have generally found that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation" (internal quotation marks omitted)); *Dixon*, 416 F. App'x at 110-11 (four-month gap insufficient to constitute "circumstantial evidence of causation"); *Morales v. City of New York*, 525 F. Supp. 3d 463, 479 (S.D.N.Y. 2021) (collecting cases). But an inference of retaliation is all the more unreasonable in this particular context. There is no evidence that Pambianchi—the relevant decisionmaker—was aware of Plaintiff's alleged protected activities, *i.e.*, the April 2015 email or her recording of the March 6, 2015 meeting. *See* Pl. Dep. at 154-55; ECF No. 73-26 ¶¶ 55, 56; ECF No. 73-63 ¶ 39; *see also Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) ("The lack of knowledge on the part of particular *individual* agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment."). And though Plaintiff may disagree with Pambianchi's ultimate conclusion that Plaintiff was not "providing sufficient value to continue warranting a fulltime position with the company," ECF No. 73-63 ¶ 31, she does not dispute the accuracy of Pambianchi's reasons for issuing the ultimatum: Plaintiff was "unhappy

and dissatisfied" in her current "non-traditional" position, *id.*; Pl. Dep. at 40-41, 145-46; ECF No. 73-65 at 28, she had "inconsistent and sporadic work assignments" during her tenure, ECF No. 73-63 ¶ 31, Pl. Dep. at 114, 125, 146-47, ECF No. 73-26 ¶¶ 71-74, ECF No. 73-65 at 29, and she had not applied to any "traditional" position in 2014 or 2015, ECF No. 73-63 ¶ 31; Pl. Dep. at 97.

Under these circumstances, temporal proximity alone is insufficient to show that "a causal connection exists between [Plaintiff's] protected activity" and the ultimatum/termination. *Dixon*, 416 F. App'x at 110. As a result, there is insufficient evidence to support a *prima facie* case of retaliation, and Plaintiff's retaliation claims must be dismissed.

## CONCLUSION

For these reasons, Corning's motion for summary judgment (ECF No. 73) is GRANTED. Plaintiff's second amended complaint is DISMISSED. The Clerk of Court is directed to enter judgment in favor of Corning and close the case.

IT IS SO ORDERED.

Dated: July 18, 2023
      Rochester, New York             HON. FRANK P. GERACI, JR.
                                    United States District Judge
                                    Western District of New York